**UNITED STATES of America**

v.

**ASHER, Robert B., Appellant.**

**Nos. 87–5096, 87–5213.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 20, 1987.

Reargued April 11, 1988.

Decided July 20, 1988.

1484

William G. Hundley (argued), Larry S. Gondelman (argued), Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for appellant.

James J. West (argued), U.S. Atty., Harrisburg, Pa., for appellee.

Before HIGGINBOTHAM, SLOVITER and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This appeal is from a conviction that arose out of events transpiring in the context of contract negotiations between officials of the Commonwealth of Pennsylvania and CTA, Limited ("CTA"), a California corporation that specialized in recovering overpaid Social Security taxes ("FICA") for

businesses and their employees.[1] Appellant Robert B. Asher ("Asher"), former Chairman of the State Republican Committee, R. Budd Dwyer ("Dwyer"), former Treasurer of the Commonwealth, and William T. Smith, Jr. ("Smith"), an attorney in private practice and the former Republican Party Chairman of Dauphin County, Pennsylvania, were involved in a scheme to accept bribes from John R. Torquato, Jr. ("Torquato"), a CTA official, in exchange for awarding a FICA recovery contract to CTA.

As a result of the scheme, Asher was convicted by a jury of one count of conspiracy to violate the federal mail fraud and interstate transportation in aid of racketeering ("ITAR") statutes, in contravention of 18 U.S.C. § 371 (1982); on five counts of mail fraud, in contravention of 18 U.S.C. § 1341 (1982); on three ITAR counts, in contravention of 18 U.S.C. § 1952 (1982); and on one perjury count, in contravention of 18 U.S.C. § 1623 (1982). He was sentenced to concurrent one year and one day prison terms on each count and was ordered to pay fines and special assessments amounting to $205,050.

On appeal, Asher argues that his mail fraud, conspiracy and perjury convictions must be overturned in light of the Supreme Court's recent decision in *McNally v. United States,* — U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).[2] He also claims that the district court's instructions to the jury constituted an impermissible amendment of the government's indictment. Asher's final claim is that the district court abused its discretion in allowing a prosecution witness, Smith, whose credibility had not been attacked by Asher, to read into evidence a written statement that Smith made in 1984 for purposes of negotiating immunity.

We are not persuaded by either of the first two of Asher's arguments and thus will not vacate his conviction on these grounds. Moreover, while we find merit in Asher's final argument, we are satisfied that the district court's ruling to admit Smith's prior consistent statement amounts to harmless error when viewed in conjunction with the remaining evidence adduced by the government. Accordingly, we will affirm the district court's order of March 20, 1987, which denied Asher's motion for judgment of acquittal or, in the alternative, for a new trial.

## I.

Robert B. Asher was elected Chairman of the Republican Party of the Commonwealth of Pennsylvania in 1983. Soon thereafter, he received a telephone call from William T. Smith, who was calling on behalf of his client John Torquato. Smith was seeking Asher's assistance in arranging a meeting between Torquato and Robin Ross, a representative of Richard Thornburgh, who at the time was Governor of the Commonwealth of Pennsylvania. When Asher learned that Ross was not available, he set up a meeting between Torquato and John Pierce, who also worked for the Governor.

On the day of the meeting with Pierce, Smith and Torquato first stopped at Asher's office in Harrisburg. They explained to Asher that FICA recovery provided an easy—and, to the Governor, a beneficial— way for Pennsylvania to recover a significant amount of money for itself and its state employees.[3] Smith and Torquato ex-

---

1. The facts giving rise to this appeal are discussed in greater detail in *United States v. Smith,* 789 F.2d 196, 198–200 (3d Cir.) *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Our factual account differs somewhat because it is drawn exclusively from the evidence presented at the trial of appellant Robert B. Asher. *See also United States v. Asher,* 648 F.Supp. 320 (M.D.Pa.1986).

2. In Asher's statement of issues presented for review, Asher has not included any attack on his perjury conviction which was the subject of Count 13 of the indictment. However, even though Asher has not directly challenged that conviction on appeal, he refers in his brief to the fact that evidence erroneously admitted with respect to his mail fraud conviction "spilled over" and tainted his perjury conviction as well. We do not find this argument compelling.

3. The indictment explains the process of recovering FICA funds as follows:

 Under the Federal Social Security Act workers employed by state and local governments can be covered by Federal Old–Age and Survivors

pressed to Asher their hope that the Governor's office would award CTA the contract to perform such recovery. At Asher's trial, Torquato testified that, during this meeting with Asher, Smith had specifically mentioned that CTA would make a $300,000 campaign contribution, to be divided equally among the Treasurer, the Treasurer's re-election campaign, and the Republican State Committee, if CTA was awarded the contract.

The Governor's office failed to award the FICA recovery contract for state employees to CTA. Thereafter, in a sequence of events that is not directly related to this appeal, the Pennsylvania state legislature enacted legislation that removed authority to award FICA recovery contracts from the Governor and granted that authority to the state Treasurer, who, at the relevant time, was Dwyer. That legislation was subsequently signed into law by Governor Thornburgh.[4]

Smith and Torquato next met with Asher to discuss FICA recovery in March 1984. At that time, CTA was pursuing a FICA recovery contract for teachers and other school district employees. Smith and Torquato explained to Asher that, due to the new legislation, any state checks representing FICA refunds would be signed by Dwyer. They also explained the obvious political benefits to the Republican party.

Torquato testified that, at this March 1984 meeting, he and Smith informed Asher that Smith and Dwyer had previously agreed that CTA, in order to secure the FICA recovery contract, would make "campaign contributions" of $300,000. Smith, on the other hand, testified that Asher had learned before this meeting of Smith's offer to Dwyer, and that Asher was the one who brought it up at the meeting.

After this meeting, Smith called Asher on numerous occasions, seeking his aid in getting Dwyer to meet with CTA to negotiate a contract. Ultimately, CTA was officially awarded the FICA recovery contract for approximately $5,000,000 on May 10, 1984, despite a significantly lower bid from Arthur Young, Inc. (a nationally recognized accounting firm) to perform the same services. Throughout this period, Torquato was sending Asher carbon copies or blind copies of Torquato's CTA-related correspondence.

In July 1984, the FBI began to investigate CTA and the circumstances under which the FICA recovery contract was awarded.[5] Thereafter, Torquato decided to cooperate with the government and pleaded guilty to one count of conspiracy. Smith, who had been indicted in the meantime, attempted to negotiate immunity from prosecution in exchange for his cooperation. The government refused to grant Smith immunity. Smith proceeded to trial. In his testimony, he denied offering campaign contributions to Dwyer or to Asher. Asher and Dwyer testified for the defense

---

Disability and Supplemental Income Benefits (Social Security) by a contractual agreement entered into between the state and federal government. The Commonwealth of Pennsylvania entered into such a contractual agreement with the Federal Government on August 20, 1952.

\* \* \* \* \* \*

Under guidelines set up by the Social Security Administration (Social Security Ruling 79–31), the FICA tax does not have to be paid on payments made to employees of state and local governments pursuant to a specific plan providing for payments because of sickness (as opposed to a continuation of wages in spite of sickness). If the state or local governments mistakenly made payments of FICA taxes for such periods a credit can be claimed

for such payments against future FICA taxes with a resulting refund of overpaid FICA taxes to the involved employees. This procedure is known as a FICA recovery.

\* \* \* \* \* \*

The defendant corporation[ ] ... [CTA was] ... in the business of preparing and submitting FICA recoveries on behalf of state and local governments. This service was performed pursuant to contract entitling the defendant corporations to a fee based upon the amount of the FICA recovery obtained. App. at 15–17.

4. *See, e.g.,* testimony of John Torquato, App. at 198–220.

5. The contract was invalidated by the Treasurer's office on July 9, 1984.

at Smith's trial.[6] Smith ultimately was convicted and sentenced to twelve years in prison. Thereafter, the government threatened to indict Smith's wife and law partner, Judy Smith. At that point, Smith agreed to cooperate with the government in exchange for its promise not to prosecute his wife and in the hope of reducing his own sentence.[7]

Asher and Dwyer were indicted on May 13, 1986. They were tried together in Williamsport, Pennsylvania. On December 18, 1986, the jury returned guilty verdicts against each defendant on the conspiracy, mail fraud, ITAR, and perjury counts. On January 27, 1987, as previously noted, the district court sentenced Asher[8] to concurrent prison sentences of one year and one day on each count, and imposed fines totalling $205,000 plus a mandatory special assessment of $50. App. at 1562–63. The district court subsequently granted Asher's motion for release on bail pending appeal, *United States v. Asher*, Crim. No. 86–00088–02 (M.D. Pa. February 6, 1987), but denied Asher's motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) or, in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33.

## II.

Asher's first, and most troubling, claim on appeal is that the Supreme Court's recent decision in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), which was filed after Asher had been convicted, requires that we vacate his convictions on all counts. Although *McNally* dealt solely with the proper scope of the mail fraud statute,[9] and thus would

directly affect only the mail fraud and conspiracy to commit mail fraud counts of Asher's conviction, Asher claims that his ITAR and perjury convictions were prejudicially tainted by his wrongful mail fraud and conspiracy convictions.

■ In reviewing the district court's order, we are bound by *McNally*, despite the fact that it was decided after Asher's trial had been completed and was therefore unavailable to the district court. See *Ashcraft v. Tennessee*, 322 U.S. 143, 156, 64 S.Ct. 921, 927, 88 L.Ed. 1192 (1944); *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 170 (3d Cir.1982); *Zichy v. City of Philadelphia*, 590 F.2d 503, 508 (3d Cir. 1979). See also *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed. 2d 649 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.").

As this court has recently stated, "if ... jury instructions [in a pre-*McNally* case] allowed conviction for conduct outside the proscription of the mail fraud statute, such instructions would constitute both plain error and a defect affecting [the defendant's] due process rights." *United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). However, "when determining the effect of a single challenged instruction on the validity of a conviction, the reviewing court must view the challenged instruction in the context of the

---

**6.** Asher's testimony at Smith's trial was the basis of Asher's perjury conviction in this trial. *See* note 2 *supra.*

**7.** In this regard, Smith was not successful. *See United States v. Smith*, 839 F.2d 175 (3d Cir. 1988) (affirming district court's denial of Smith's Fed.R.Crim.P. 35(b) motion for reduction of sentence).

**8.** On January 27, 1987, the day before Dwyer was scheduled to be sentenced by the district court, Dwyer committed suicide by shooting himself at a press conference he had called in Harrisburg, Pennsylvania.

**9.** The pertinent language of the mail fraud statute states that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... knowingly causes to be delivered by mail according to the direction thereon ... any ... matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1341.

overall charge rather than in 'artificial isolation.'" *Id.* (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) (citing *Boyd v. United States,* 271 U.S. 104, 107, 46 S.Ct. 442, 443, 70 L.Ed. 857 (1926))); *United States v. Park,* 421 U.S. 658, 674, 95 S.Ct. 1903, 1912, 44 L.Ed.2d 489 (1975). The Supreme Court has pointed out:

> a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

*Cupp,* 414 U.S. at 147, 94 S.Ct. at 400 (quoted in *Piccolo,* 835 F.2d at 519). With these principles in mind, we turn to an analysis of Asher's appeal in light of *McNally* and its progeny.

### A. The Pre-McNally Decisions and McNally

In *McNally,* the Supreme Court assessed for the first time whether the statutory language and legislative history of the mail fraud statute, 18 U.S.C. § 1341, *see* note 9 *supra,* would support a long line of court of appeals decisions that had interpreted the statute as proscribing schemes by government officials to defraud citizens of their *intangible* rights to honest and impartial government.[10] These decisions, including this court's contribution in *United States v. Clapps,* 732 F.2d 1148, 1152 (3d Cir.), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984), had held that because a public official owes a duty of honesty and integrity to his constituency, any misuse of his office for personal gain is a fraud. *McNally,* 107 S.Ct. at 2879–80. *See generally* Comment, *The Intangible-Rights Doctrine and Political-Corruption Prosecutions Under the Federal Mail Fraud Statute,* 47 U.Chic.L.Rev. 562, 563 (1980). These cases found a violation of the mail fraud statute where public officials had failed to perform their duties honestly, despite the fact that the acts by public officials were not "aimed at causing deprivations of money or property." *McNally,* 107 S.Ct. at 2880.[11] Moreover, even a private individual who had no formal official duty to the public could be held to the honest and faithful standard required of an official, if others depended on him " 'because of a special relationship in the government' and he in fact makes governmental decisions." *McNally,* 107 S.Ct. at 2879 (*quoting United States v. Gray,* 790 F.2d 1290, 1296 (6th Cir.1986) (*quoting United States v. Margiotta,* 688 F.2d 108, 122 (2d Cir.1982), *cert. denied,* 461 U.S.

---

**10.** *See, e.g., United States v. Clapps,* 732 F.2d 1148, 1152 (3d Cir.), *cert. denied,* 469 U.S. 1085, 105 S.Ct. 589, 83 L.Ed.2d 699 (1984); *United States v. Mandel,* 591 F.2d 1347, 1359–60 (4th Cir.) *aff'd in part on reh'g,* 602 F.2d 653 (4th Cir.1979) (en banc) (per curiam), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Rabbitt,* 583 F.2d 1014 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Keane,* 522 F.2d 534 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1979); *United States v. Isaacs,* 493 F.2d 1124 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974); *United States v. States,* 488 F.2d 761 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974).

**11.** As the D.C. Circuit has recently pointed out, the line of mail fraud cases embracing the intangible rights doctrine has been severely criticized by both judges and commentators. *See United States v. Perholtz,* 836 F.2d 554, 557 (D.C. Cir.1987) (citing *United States v. Margiotta,* 688 F.2d 108, 139 (2d Cir.1982) (Winter, J., dissenting in part), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Bronston,* 658 F.2d 920, 930–31 (2d Cir.1981) (Van Graafeiland, J., dissenting), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); Coffee, The Metastasis of Mail Fraud: The Continuing Story of the "Evolution" of a White–Collar Crime, 21 Am.Crim.L.Rev. 1 (1983); Lynch, RICO: The Crime of Being a Criminal (pt. 2), 87 Colum.L.Rev. 713, 741–42 (1987)).

However, even in the face of such criticism, every lower federal court that had been called on to consider the issue had recognized the application of the intangible rights doctrine under the mail fraud statute. *See* The Supreme Court, 1986 Term—Leading Cases, 101 Harv.L. Rev. 119, 329–330 & n. 4 (1987).

913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983) (political party leader)).

*McNally* involved a scheme by James Gray, a former member of the Governor of Kentucky's cabinet, Charles McNally, a private citizen, and Howard Hunt, former Chairman of Kentucky's Democratic Committee, whereby Gray, McNally and Hunt agreed to purchase a workmen's compensation policy for the Commonwealth of Kentucky from Wombwell Insurance Company in return for a promise from Wombwell that it would pay a portion of its commissions to other insurance agencies owned and controlled by McNally, Hunt and Gray. Upon discovery of this self-dealing scheme —which funnelled some $850,000 to agencies designated by Hunt—Gray and McNally were prosecuted on the theory that the scheme defrauded the citizens of Kentucky of their intangible right to honest government.[12] The jury instructions at issue in *McNally* referred to intangible, non-property losses by Kentucky as the basis for a mail fraud conviction. Gray and McNally were convicted of mail fraud and their convictions affirmed on appeal. *United States v. Gray*, 790 F.2d 1290 (6th Cir.1986).

After reviewing the statutory history of the mail fraud statute and after analyzing congressional intent, the Supreme Court in *McNally* overturned the line of cases based on the intangible rights theory, holding that the "mail fraud statute clearly protects property rights, but does not refer to the intangible right of the citizen to good government." *McNally*, 107 S.Ct. at 2879.

Although the Supreme Court acknowledged that the mail fraud statute's elements "to defraud" and "for obtaining money or property by means of false or fraudulent pretenses, representation or promises" are presented in the disjunctive and thus *could* be construed independently, it relied on its holding in *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924) to conclude that the term "to defraud" "commonly refer[s] to wronging one in his property...." *McNally*, 107 S.Ct. at 2880–81.

The Supreme Court also relied on the oft-invoked rule of construction which requires that when "two rational readings of a criminal statute, one harsher than the other," are possible, the least harsh of the two must be chosen unless Congress has clearly spoken to the contrary. *Id.* 2881 (citing *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)). The Supreme Court thus concluded that "Congress' intent in passing the mail fraud statute was to prevent the use of the mails in furtherance of such [money- or property-depriving] schemes." *Id.*

### B. The Post-McNally Decisions

Some five months after deciding *McNally*, the Supreme Court filed its first opinion which clarified *McNally*. In *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), R. Foster Winans, one of the authors of the Wall Street Journal's ("Journal") daily "Heard on the Street" column,[13] made the information, to

---

**12.** The indictment charged that Gray and McNally (as an aider and abettor) had designed their scheme and utilized the mail service "(1) to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly, and (2) to obtain.... money and other things of value by means of false pretenses and the concealment of material facts." *McNally*, 107 S.Ct. at 2878. Hunt had previously pleaded guilty to mail and tax fraud. The district court instructed the jury that it could find the defendants guilty if they had aided and abetted Hunt in the scheme without disclosing that Hunt had an ownership interest in the entities to which payments from Wombwell had been directed. The charge did not require a finding that Kentucky had been deprived of any money or property, nor was evidence adduced proving that but for the

scheme, Kentucky would have paid lower insurance premiums.

**13.** This daily column commonly contained a discussion and assessment of selected stocks and "a point of view with respect to investment in the stocks that it review[ed]." 108 S.Ct. at 319 (quoting *United States v. Winans*, 612 F.Supp. 827, 830 (S.D.N.Y.1985)). Winans interviewed corporate executives and then "put together interesting perspectives on the stocks that would be highlighted in upcoming columns...." *Id.* Because of the column's perceived "quality and integrity," the views and analyses expressed in the column had a potential impact on the price of the stocks it analyzed. *Id.*

be contained in the column, available to a securities broker prior to the column's publication. Because the column's discussion of various stocks often had either a positive or adverse impact on the prices of those stocks, the selective release of confidential information prior to its publication allowed Winans and his co-conspirators to trade on the basis of the "probable impact of the column on the market." *Id.*

Winans was ultimately convicted for both mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The Second Circuit subsequently upheld the conviction on the theory that Winans had fraudulently misappropriated "intangible property" from the Journal within the purview of the mail and wire fraud statutes. On appeal to the Supreme Court, Winans argued, among other things, that his convictions for mail and wire fraud were invalid under *McNally,* because the Journal had not been deprived of "money or property." *Id.* 108 S.Ct. at 320.

The Supreme Court disagreed, and affirmed the Second Circuit's decision. It held that *"McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* The Supreme Court sustained Winans' conviction on the ground that the confidential information secretly parlayed into profits by Winans, constituted that form of "intangible property" in which the Journal had a proprietary interest and which constituted "property" within the meaning of the mail fraud statute. *Id.* While the *Carpenter* Court broadly interpreted the meaning of "property interests" by making it clear that a mail fraud conviction could be sustained even in the absence of a purely monetary or tangible property loss, the Supreme Court noted that the Journal had been "defrauded of much more than its contractual right to [Winans'] honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights.'" *Id.* (quoting *McNally,* 107 S.Ct. at 2881 n. 8).

In the wake of the Court's decisions in *McNally* and *Carpenter,* a significant number of pre-*McNally* criminal convictions have been challenged on the ground that they were based on the now outlawed intangible rights doctrine. In response to these challenges, the courts of appeals have sought to analyze and apply *McNally* and *Carpenter* within an appropriate framework. Those cases in which a conviction was based entirely on the intangible rights theory of mail fraud, and in which the instructions to the jury could not assure that money or property interests were implicated, have been overturned on *McNally's* authority. *See, e.g., United States v. Conover,* 845 F.2d 266 (11th Cir. 1988); *United States v. Ochs,* 842 F.2d 515 (1st Cir.1988); *United States v. Holzer,* 840 F.2d 1343 (7th Cir.1988); *United States v. Matt,* 838 F.2d 1356 (5th Cir.1988); *United States v. Covino,* 837 F.2d 65 (2d Cir.1988); *United States v. Murphy,* 836 F.2d 248 (6th Cir.1988); *United States v. Gordon,* 836 F.2d 1312 (11th Cir.1988); *United States v. Murphy,* 836 F.2d 248 (6th Cir. 1988); *United States v. Cooke,* 833 F.2d 109 (7th Cir.1987); *United States v. Gimbel,* 830 F.2d 621 (7th Cir.1987); *United States v. Herron,* 825 F.2d 50 (5th Cir. 1987).

However, in those cases in which courts have concluded that monetary or property losses have resulted from fraudulent schemes, convictions have been upheld on the basis of those losses, despite the fact that the government may have relied, at least in part, on the intangible rights theory as a basis for the convictions. *See, e.g., United States v. Perholtz,* 836 F.2d 554 (D.C.Cir.1988); *United States v. Piccolo,* 835 F.2d 517; *United States v. Richerson,* 833 F.2d 1147 (5th Cir.1987); *United States v. Runnels,* 833 F.2d 1183 (6th Cir.1987); *United States v. Wellman,* 830 F.2d 1453 (7th Cir.1987); *United States v. Fagan,* 821 F.2d 1002 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). This court's recent decision in *United States v. Piccolo,* 835 F.2d 517 provides an excellent example of a post-*McNally* analysis.

In *Piccolo*, the defendant, Anthony Piccolo, participated in a commercial kickback scheme in which he caused his company to issue false invoices as part of a money laundering operation. For his efforts in facilitating the laundering of monies, Piccolo kept part of the money paid to his company.

The district court's jury instructions implicated both property losses allegedly suffered by Piccolo's employer and intangible losses arising from Piccolo's dishonesty. The property rights component of the instruction included references to Piccolo's receipt of a bribe and to money lost by a second company (not his employer) as a result of the fraudulent scheme. The district court's instructions stated that in order to return a conviction, the jury must find "that the defendant devised a scheme or artifice to defraud [his employer] United Engineers of its right to the honest, faithful and loyal services of its employee ... and further, to defraud both United Engineers and Delmarva Power and Light Company of money." 835 F.2d at 520.[14]

On appeal, Piccolo argued, as does Asher in the instant case, that his mail fraud conviction should be overturned because the district court's instructions permitted the jury to convict him for conduct outside the post-*McNally* parameters of the mail fraud statute. Piccolo claimed that the jury was permitted to convict him of mail fraud if it found that he had participated in a scheme to defraud his employer of its right to his honest and faithful services, even if the object of wrongfully obtaining money or property was not part of the scheme.

In analyzing the district court's instructions, we stated that "a plain reading of [the instructions] fairly compels the conclusion that Piccolo could be convicted of mail fraud only if the jury found that he participated in a scheme to defraud United Engi-

neers ... of money." *Id.* at 520. We continued by stating that "[e]ven if we assume that the [intangible rights instruction] was a misstatement of the law in the present context, we find that the jury could not, given the totality of the instructions, have convicted Piccolo unless it found that an object of the scheme in which he participated was to obtain money from Delmarva Power." *Id.* Accordingly, we found no reversible error in the jury instructions. *But see id.* at 521 (Aldisert, J., dissenting).

A similar outcome was reached by the Sixth Circuit in *United States v. Runnels*, 833 F.2d 1183 (6th Cir.1987), though on a somewhat different and more creative theory, and one to which we do not necessarily subscribe. In *Runnels*, Frank Runnels, the President of Local 22 of the United Automobile Workers ("UAW"), took bribes in return for referring workers' compensation cases to a particular law firm. Runnels was subsequently charged with committing mail fraud by obtaining money through false and fraudulent pretenses and by depriving Local 22 of his fair and honest services. After he had been convicted, Runnels appealed his conviction, arguing that it could not stand in light of *McNally*.

In affirming Runnels' conviction, the Sixth Circuit relied on principles of agency law, reasoning that, because Runnels received a bribe in his role as Local 22's president, that money rightfully belonged to the Local, of which he was an agent. The court stated that:

> [t]he existence of ... a bribe or kickback makes it unnecessary to invoke intangible rights doctrine. The fiduciary's acquisition of an economic benefit which properly belongs to the principal, through an intentional breach of a fiduciary duty owed to the principal, is in itself sufficient to support a finding of guilt under 18 U.S.C. § 1341.

**14.** In his dissenting opinion, Judge Aldisert noted that the charge to the jury contained pervasive references to the permissibility of convicting Piccolo on the basis of his failure to render honest and faithful services to his employer. *See Piccolo*, 835 F.2d at 521–22 (Aldisert, J., dissenting). Thus, it is readily apparent that the

majority in *Piccolo* considered the district court's instructions in their entirety and was willing to tolerate the presence of intangible rights language so long as concrete economic interests of Piccolo's employer were affected by the fraudulent scheme at issue in the case.

*Runnels,* 833 F.2d at 1187. The court, relying primarily on the constructive trust argument made in Justice Stevens' dissent in *McNally,*[15] supported its conclusion on the ground that the financial benefit obtained by fiduciary in the form of a bribe belongs to the entity to whom he has a duty, and by accepting the bribe, the fiduciary has deprived that entity of property or money in which it has an ownership interest. *Id.* Thus, the court affirmed Runnels' conviction, concluding that "the economic deprivation to the principal which occurs when the fiduciary knowingly breaches his duty by accepting a bribe, the value of which properly belongs to the principal, is itself sufficient to support a finding of taking of value." *Id.*[16]

In two subsequent cases, the Fifth Circuit used an analysis somewhat similar to the analysis used by the Sixth Circuit in *Runnels,* in affirming post-*McNally* mail fraud convictions dependent in part on the presence of an intangible right. *See U.S. v. Richerson,* 833 F.2d 1147 (5th Cir.1987); *United States v. Fagan,* 821 F.2d 1002 (5th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). Unlike the Local union in *Runnels* however, the employers in both *Fagan* and *Richerson* suffered direct monetary losses in addition to being deprived of intangible rights.

*Fagan* involved a kickback scheme in which Ralph Fagan, the owner of two companies engaged in the leasing of work boats to offshore oil companies, would pay kickbacks to Donald Riley, the drilling manager for an offshore company, in exchange for a promise that Riley's employer would lease boats from Fagan's companies. In finding that Riley's employer had been economically disadvantaged by Fagan's scheme because it *might* have received some of the economic benefits being kept by Riley, the Fifth Circuit was able to comply with the requirements of *McNally* and to affirm Fagan's conviction, despite the arguably intangible (breach of duty of loyalty) nature of the losses to Riley's employer. *See Fagan,* 821 F.2d at 1011 n. 6.

Similarly, in *Richerson,* an employee (Richerson) of an offshore oil drilling contractor accepted kickbacks from oil rig parts vendors in exchange for steering business to those vendors. The kickbacks were financed by money received from false invoices submitted to Richerson's employer by the vendors. Thus, Richerson's employer was deprived of Richerson's honest services and unknowingly financed the kickbacks. At Richerson's trial, the jury was instructed, *inter alia,* that "... the object of a fraudulent scheme need not be the deprivation of a tangible interest. Artifices designed to cause losses of an intangible nature also violate the statute." *Richerson,* 833 F.2d at 1156. Despite this jury instruction, which allowed for a conviction without a finding of monetary or property loss by the employer, *see id.* at 1156–57,

---

**15.** Justice Stevens, writing in dissent in *McNally,* stated in footnote 10 of his opinion that:

When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for. Additionally, "[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement, (Second) of Agency § 403 (1958). This duty may fulfill the Court's "money or property" requirement in most kickback schemes.

*McNally,* 107 S.Ct. at 2890–91 n. 10 (Stevens, J., dissenting). The *Runnels* Court relied on the theory expressed in footnote 10 in upholding Runnels' conviction. *See* 833 F.2d at 1186–92.

**16.** The "constructive trust" analysis used by the Sixth Circuit in *Runnels* has recently been rejected by the Seventh Circuit in *United States v. Holzer,* 840 F.2d 1343 (7th Cir.1988). In *Holzer,* the Seventh Circuit vacated a mail fraud conviction where the jury had received an "intangible rights" instruction. The *Holzer* court rejected the government's constructive trust theory on the ground that receiving a bribe does not deprive one's employer of property because the bribe money was never intended for the employer. *Holzer,* 840 F.2d at 1347. The *Holzer* court distinguished *Runnels* from *Carpenter v. U.S.,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), by differentiating between "taking one's employer's property by fraud (*Carpenter*), and failing to convey the receipts of bribery to one's employer [*Runnels*]...." *Holzer,* 840 F.2d at 1347. *Holzer* further criticized the *Runnels* analysis by reasoning that the fiction of a constructive trust ultimately relied upon to affirm in *Runnels* was never presented to the jury by the prosecution. *Id.*

the Fifth Circuit upheld Richerson's conviction citing to Justice Stevens' footnote. In doing so, the Fifth Circuit stated that "[t]he *McNally* majority did not disagree with Justice Stevens' comments regarding employee's breaches of loyalty." *Id.* at 1157.

The *Richerson* court's primary reliance was on the Supreme Court's decision in *Carpenter.* The Fifth Circuit stated that "Richerson's concealment of material information from his employer is analogous to the *Carpenter* defendant's disclosure of his employer's material information." *Id.* Noting that "the overriding and predominant theory of the Government's case involved [the employer's] loss of money and property," the *Richerson* court minimized the intangible rights language in the challenged jury instruction and affirmed. *Id.*

Unlike the Fifth Circuit's interpretation of *McNally* in *Richerson* and *Fagan,* each of which relied at least in part on Justice Stevens' *McNally* dissent, the Seventh Circuit has upheld a pre-*McNally* conviction on a somewhat broader theory. It held that a conviction may be affirmed where an evaluation of the indictment, jury instructions, and proof in the case leads to the conclusion that monetary or property losses underlay the fraudulent scheme at issue. *United States v. Wellman,* 830 F.2d 1453 (7th Cir.1987).

In *Wellman,* Glenn Wellman, the chief executive officer of a shipping tank manufacturer, sold a number of refurbished shipping tanks to M–Chem Chemical Company after having assured M–Chem that the tanks met government specifications. After the government discovered that Wellman had made a series of fraudulent misrepresentations about the tanks' specifications, Wellman was indicted on charges that he had engaged in a scheme to defraud M–Chem of its right to have tanks which complied with government regulations. The indictment specifically charged that Wellman's scheme had defrauded M–Chem of "its right to have safe and authorized equipment for the storage and shipment of hazardous chemicals and of its right to know that equipment it purchased

was in full compliance with D.O.T. regulations...." *Id.* at 1462.

Notwithstanding the intangible character of this part of the indictment, the Seventh Circuit affirmed Wellman's conviction. The Court emphasized that the district court's instructions had required the jury to find that Wellman had intended to "deprive another of something of value," *id.* at 1463, and that the harm to M–Chem, i.e., the money it paid Wellman for the substandard tanks, "was anything but 'intangible.'" *Id.* The court further noted that "Wellman's scheme clearly involved 'wronging [M–Chem] in [its] property rights by dishonest methods or schemes.'" *Id.* (brackets in original) (quoting *McNally,* 107 S.Ct. at 2881). Thus, the Seventh Circuit looked beyond portions of the language in the indictment and jury instructions that referred to intangible rights, and instead focused on the ultimate monetary losses that were clearly part of Wellman's fraudulent scheme. *Id.*

The District of Columbia Circuit was presented with an opportunity to analyze and apply *McNally* in *United States v. Perholtz,* 836 F.2d 554 (D.C.Cir.1987) (per curiam) but in a bail pending appeal context rather than on a direct appeal of a mail fraud conviction. In *Perholtz,* the appellants developed a computerized payroll system and data communications system for use by various federal agencies. They were convicted by a jury of mail fraud committed in furtherance of a kickback scheme whereby they received unearned commissions from subcontractors of one of the systems. On appeal of the district court's denial of appellants' motion for release on bail pending appeal, the D.C. Circuit affirmed the district court on the ground that the *McNally* issue did not raise a substantial question on appeal. The Court's analysis—which focused on bottom-line monetary losses in much the same way as did the Seventh Circuit's analysis in *Wellman*—was predicated on the theory that the scheme,

> ensured that the 'negotiated' cost of the subcontracts was higher than the price at which the subcontractors would have

been willing to contract, and ensured that this higher cost was passed through to the [government] in its cost-plus contract with the prime contractor. The defendants' scheme caused the [government] to pay more than it need have, so it cannot be said that the cost would necessarily have been paid to some company in the sense that this was true in *McNally*. In fact, a lesser cost could have been paid to the prime contractor if the defendants had negotiated subcontracts that did not include the cost of bogus marketing agreements and other kickbacks.

*Id.* at 558.

Thus, despite the fact that the indictment and the jury charge included classic intangible rights language, *see Perholtz*, 836 F.2d at 559, the D.C.Circuit concluded that, when taken together and in their respective totalities, the jury charge and the indictment required that the jury find a tangible property loss by the government in order to convict. *Id.*

### III.

### A.

Although the outcomes in the post-*McNally* cases we have discussed vary depending on the facts, indictments, and jury instructions of the particular case, a common thread running through each of these cases can be discerned. While we recognize that cases may fall on either side of the *McNally/Carpenter* line, those cases that have *sustained* mail fraud convictions have done so where the "bottom line" of

the scheme or artifice had the inevitable result of effecting monetary or property losses to the employer or to the state. This common thread appears despite references in the indictments, proofs, or instructions to violations of intangible rights.

■ Essentially, therefore, where rights are involved whose violation would lead to no concrete economic harm, and where those rights are the only rights involved in the case, *McNally*'s proscriptions would prevent upholding conviction on appeal. Where, on the other hand, a violation of the rights involved would result in depriving another of something of value, and the indictment, the proofs and the instructions are based on that fact, then the presence of intangible rights language will not prove fatal on appeal.

With these precepts in mind, and with the cases which we have discussed as a backdrop, we turn to a consideration of the facts of this case.

### B.

Not surprisingly, the government urges us to affirm Asher's conviction primarily on the authority of *Piccolo, Runnels, Richerson, Wellman* and *Perholtz*, each of which recognized a real or potential property loss and affirmed a pre-*McNally* mail fraud conviction on that basis.[17] The government's supplemental brief emphasizes passages from the indictment[18] and the jury instructions, both of which contain references to tangible losses by the Commonwealth of Pennsylvania.[19] For exam-

---

**17.** Initially, we heard oral argument on October 20, 1987. *United States v. Carpenter,* — U.S. —, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) and many of the other cases to which we have referred in this opinion, including this Court's decision in *United States v. Piccolo,* 835 F.2d 517 (3d Cir.1987), which we have discussed in text *supra* at 1492, were filed after the October 20th date. We thereupon asked counsel to submit supplementary briefs discussing these authorities. On April 11, 1988, we heard argument.

**18.** The indictment was sent out with the jury during its deliberations. *See* TR of December 15, 1986 at 100.

**19.** In both his original and supplemental briefs, Asher asserts that all references to tangible losses were withdrawn from the indictment by the government during the argument on instructions. The government disputes Asher's characterization of the events leading up to the court's jury instructions, arguing that it never sought to withdraw those aspects of the indictment regarding the loss of tangible property rights by the Commonwealth. It is apparent from the record that neither the court nor the parties ever reached a clear resolution of this issue prior to the time the court delivered its charge to the jury. *See, e.g.,* App. at 1302–04. The charge itself, however, explicitly refers to tangible losses by the Commonwealth, *see, e.g,* App. at 1523, 1538, 1540–42 & 1545.

ple, the indictment charges that the scheme devised by Asher and his co-conspirators was designed to "grant, or cause to be granted, lucrative FICA recovery contracts without competitive bidding, notwithstanding the fact that others were willing to perform substantially identical FICA recovery work at a much lower cost ..." App. at 22.[20] The indictment also alleges that one of the objects of the fraudulent scheme was "to defraud the citizens of the Commonwealth of Pennsylvania and the employees entitled to share in a FICA recovery of tangible monetary savings and financial benefits ..." App. at 24.

Like the indictment, the jury instructions in the instant case disclose a number of references to concrete economic or property losses by the Commonwealth. For example, in defining intent to defraud, the instructions charge that the jury may find such intent if it finds that the defendants sought "to deceive for the purpose of either causing some financial loss to another, or losses of an intangible nature, or bringing about financial gain to one's self, or for any of these purposes." App. at 1523. In describing the objects of the conspiracy to defraud in the jury instructions, as set forth in the indictment, the court stated that "[o]ne object involves a statutory

right, and one object involves a property right." App. at 1538. In summarizing its conspiracy instructions, the district court once again referred to tangible property interests, stating that:

> ... Where the statutory duty of refraining from bribery is concerned, or if you find that one of the objects of the conspiracy was *to defraud of the tangible savings coming from an impartially awarded contract,* you do not have to consider the public official defendant first, but may consider both defendants and find either one or the other, or both, either guilty or innocent, as the facts indicate.

App. at 1540–41 (emphasis added).

It is true that the jury instructions in the present case, like those in *Piccolo, Perholtz* and *Wellman,* made references to intangible losses incurred by the citizens of the Commonwealth. However, we are unable to hypothesize a set of circumstances under which this jury could have found Asher guilty of depriving the citizens of the Commonwealth of their right to honest government (an impermissible intangible right under *McNally*) without also having found that Asher was involved in a scheme, the sole purpose of which was to ensure that CTA obtained a no-bid FICA recovery

---

Thus, despite the confusion as to what the parties agreed upon with respect to the jury instructions prior to the charge being given to the jury, we are satisfied that both the indictment and the jury charge contained references to tangible losses by the Commonwealth sufficient to have made those losses an integral part of the government's case.

20. The government produced evidence showing that Arthur Young, Inc., offered to perform the services contemplated by the FICA recovery contract for a maximum amount of $2.8 million plus a fee of 7½% of the total recovery. This would have resulted in a substantially lower overall charge to the Commonwealth. Indeed, Charles Collins, Arthur Young's former director of Management Consulting in Pittsburgh, testified that Arthur Young was ready to negotiate a contract that was significantly less expensive than the CTA contract and that Dwyer was clearly aware of Arthur Young's position prior to committing the contract to CTA. The record also indicates that sixteen additional competitors were willing to be considered for the FICA recovery contract and that a number of them had actually communicated with the Treasurer's

office by teletype to request an opportunity to bid on the contract. *See* Appellee's Brief at 23 referring to Government Exhibits 44 and 57; TR of November 25, 1986 at 19–163.

Moreover, the Secretary of the Budget for the Commonwealth of Pennsylvania, Robert Bittenbender, testified that an in-house recovery of overpaid FICA taxes on behalf of state employees had been accomplished on behalf of all state employees by using state computers at an estimated cost of $200,000. Bittenbender also testified that he would have made the employees who worked on this project available to the Treasury Department, had he been asked to do so. *See* TR of Nov. 25, 1986 at 165–81.

Thus, the record contains a plethora of government evidence demonstrating the potential savings the Commonwealth would have received had the FICA recovery contract not been awarded to CTA on a no-bid basis. These potential monetary savings by the Commonwealth were made evident during the trial and clearly support the government's claim that tangible losses by the Commonwealth would have resulted from the scheme devised by Asher and his co-conspirators had the scheme succeeded.

contract at a substantially greater cost to the Commonwealth than a contract obtained through traditional competitive bidding. Indeed, as we have noted in note 20 *supra,* the government submitted evidence that Arthur Young, Inc. was willing and able to perform the same services as CTA but at a substantially lower cost to the Commonwealth than CTA's contract.

 Thus, every aspect of the charged crime considered by the jury in this case involved some potential tangible loss to the Commonwealth. Indeed, even without regard to the $300,000 bribe promised by Torquato for the CTA contract, the contract itself deprived the Commonwealth of tangible savings that it would have derived from a less expensive agreement.

This is a substantially different set of circumstances from those presented in *McNally. McNally* did not involve an allegation of lost savings by Kentucky. Moreover, the focal point of the jury instructions in *McNally* was honest government rather than tangible losses by the State. *See McNally,* 107 S.Ct. at 2882. Indeed, in *McNally,* the Supreme Court went to great lengths to point out that no loss whatsoever was suffered by Kentucky. In contrast, Asher's scheme in this case obviously involved " 'wronging [Pennsylvania] in [its] property rights by dishonest methods and schemes.' " *McNally,* ─── U.S. at ───, 107 S.Ct. at 2881 (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)).

As was true of the Seventh Circuit's decision in *Wellman,* 830 F.2d at 1463, we are satisfied that the government in the instant case could not have proved a violation of intangible rights without simultaneously proving that the Commonwealth of Pennsylvania was deprived of money as the result of the no-bid contract awarded to CTA. Nor does this case present a *Runnels* situation where tangible losses could only be found by use of a legal (constructive trust) fiction (i.e., the monies paid to Runnels were never intended to be paid to his union). Here, the scheme was clearly aimed at awarding a contract, which would have had the effect of requiring Pennsylva-

nia to bear the burden of an enhanced cost for a service that was available at a substantially lower price.

Thus, the jury in this case could not have found a fraudulent scheme that consisted solely of depriving the citizens of their right to honest government that did not also involve tangible losses by Pennsylvania—losses which were inherent in the scheme for which Asher was convicted. *See, e.g., Perholtz,* 836 F.2d at 559, discussed *supra* at 1494.

Because we reject Asher's attack on his mail fraud conviction on *McNally* grounds, there is of course no need to address his ancillary attacks on the conspiracy, perjury and ITAR convictions.

### IV.

Asher also argues that the district court's instruction to the jury that Asher could be found guilty in his capacity as a *"party* official," improperly amended the indictment which charged him in his capacity as a *"public* official." App. at 20–22. Asher claims that this instruction constituted reversible error *per se* because it impermissibly broadened the indictment.

### A.

Asher begins his argument by alluding to the language in the indictment that referred to Asher as a "public official," who was being "influenced in carrying out official acts." Appellant's Brief at 27. Asher points to various general references in the indictment to the defendants as "public officials." He refers particularly to the perjury count (Count 13), which characterizes Asher as a public official. Count 13 recites:

The above false declaration was material because the indictment then being tried by the District Court and Jury charged that the named defendants conspired to violate the mail fraud statute ... by, among other ways, offering large cash payments and political contributions to elected public officials and the defendant, ROBERT B. ASHER, was at that time a

public official as defined by the applicable law.

App. at 55.

■ For at least three reasons we reject Asher's argument. First, notwithstanding the indictment's references to the defendants as "public officials," *see, e.g.,* Count 1 ¶ 3(c)–(g), App. at 20–22, the indictment at its outset clearly identifies Asher as the Chairman of the State Republican Committee of Pennsylvania. The indictment states that "[a]t all times relevant to the indictment, ROBERT B. ASHER was Chairman of the Republican State Committee of Pennsylvania." App. at 17.

Second, Pennsylvania's bribery statute, 18 Pa. Cons. Stat. Ann. § 4701 (Purdon 1983), which is the statute underlying the mail fraud counts, makes no distinction between public servants and party officials— both are equally culpable for offering or accepting a bribe.[21]

Third, the district court went to great lengths to explain Asher's position as a party official and to distinguish it from Dwyer's position as a public servant. *See, e.g.,* App. at 1539. This instruction was also repeated at a later stage in the charge. *See id.* at 1544. Moreover, in defining the manner in which the jury should proceed, the court was painstakingly careful to identify and distinguish those rights owed only by a public official from those owed by a party official. *See id.* at 1540. Finally, the district court, in instructing the jury, explained the bribery statute and its application to both public officials and party officials. *See id.* at 1531, 1535 and 1537.

In addition, we cannot overlook the fact that the indictment, which was in the jury's possession and which was explained in its particulars by the district court, could have left no impression other than that Asher

was a party official. Moreover, while Asher's perjury count (Count 13) does identify Asher as a public official, it does so in recognition of the fact that Asher was not an elected public official, as were his codefendants, but was, rather, a *party* official whose activities were the equivalent of a public official's under the Pennsylvania bribery statute. *See* 18 Pa. Cons. Stat. Ann. § 4701 (Purdon 1983).

**B.**

■ We are not persuaded by Asher's contention that the district court improperly amended the indictment. In order to rise to the level of an impermissible amendment, a variance must act to modify the indictment so that the defendant is convicted of a crime that involves elements distinct from those of the crimes with which he was originally charged. *See United States v. Miller,* 471 U.S. 130, 142, 105 S.Ct. 1811, 1818, 85 L.Ed.2d 99 (1985); *United States v. DeCavalcante,* 440 F.2d 1264, 1271 (3d Cir.1971). Thus, where "trial evidence [has] 'amended' the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment," *Miller,* 471 U.S. at 138, 105 S.Ct. at 1816 (emphasis in original) (quoting *Stirone v. United States,* 361 U.S. 212, 218–19, 80 S.Ct. 270, 273–74, 4 L.Ed.2d 252 (1960)), the variance violates the defendant's " 'substantial right to be tried only on charges returned by a grand jury.' " *Id.* "If, on the other hand, the variance does not alter the elements of the offense charged, [courts] focus upon whether or not there has been prejudice to the defendant...." *United States v. Castro,* 776 F.2d 1118, 1122 (3d Cir.1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d

---

**21.** The relevant portion of section 4701 states:
(a) Offenses defined.—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:
(1) any pecuniary benefit at consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a *public servant, party official* or voter by the recipient;

(2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or
(3) any benefit as consideration for a violation of a known legal duty as *public servant* or *party official.*
18 Pa. Cons. Stat. Ann. § 4701 (Purdon 1983) (emphasis added).

342 (1986). Thus, "[c]onvictions generally have been sustained as long as the proof upon which they are based corresponds to an offense that was clearly set out in the indictment." *Miller,* 471 U.S. at 136, 105 S.Ct. at 1815.

As the district court pointed out, the proof on which Asher's conviction as a party official was based does in fact correspond to an offense that was clearly identified in the indictment. Asher is alleged to have violated the Pennsylvania bribery statute, 18 Pa. Cons. Stat. Ann. § 4701, and to have been involved in a criminal conspiracy. As noted, the bribery statute refers to both public and party officials for which the elements of the crime are identical. *See id.* & note 21 *supra.* Thus, Asher could be convicted of the charged conspiracy if any member of the conspiracy in which he was involved was a public official. As the district court commented in denying Asher's motion to dismiss the indictment because of references in the indictment to Asher as a public official, "R. Budd Dwyer, the alleged co-conspirator, . . . clearly owes a fiduciary duty to the citizens. Asher, not a public servant, can be charged with conspiracy to bribe a public servant (Dwyer). Thus, the indictment, insofar as it alleges a conspiracy, is not critically defective because it labels Asher as a public official." App. at 124–25.

In summary, although the indictment contained a number of technical errors and could have been more accurately drafted, we are satisfied that it clearly distinguished Asher from his codefendants by identifying him as a party official and did not prejudice Asher. *See* App. at 17. Moreover, the elements of the crimes charged in the indictment are also the elements of the crimes for which Asher was ultimately convicted. The indictment properly gave notice of the crime for which Asher was convicted and was sufficient to allow Asher to plead his conviction as a bar to subsequent prosecutions.

## V.

In his final argument, Asher claims that the district court erred by admitting a written statement made by William Smith in early 1984 for purposes of negotiating immunity prior to his own trial in the same year. In that statement, Smith claimed, among other things, that "Robert Asher was our principal aide in getting Dwyer to act." App. at 1246–47. Smith's full statement is set out in the margin.[22]

---

22. Smith's statement, which was admitted as Government Exhibit 119 at trial, reads as follows:

> Senator John J. Shumaker in December 1983 accepted a 50–50 partnership with me for the help he would give CTA LTD in passing the legislation. He asked me to give him a short memo on FICA recovery which I did (Memo in file). Brad Shopp (Judy's brother) who is Shumaker's Administrative Assistant heard Shumaker tell me he did not want the money personally, he wanted the money put into his "campaign."
> 2. Aproximately [sic] ten days after the Marriott meeting, I met with Dwyer in his office and at the insistence of Torquato offered to give him $300,000 if he signed a contract with CTA LTD. Dwyer talked about $100,000 to him personally—$100,000 to his campaign committee—$100,000 to Republican State Committee. He was going to see Robert Asher in Montgomery County that weekend to talk to him about how this should be done. Within the next ten days I met with Torquato and Asher. Asher said that he had spoken to Dwyer and that no money would go to Dwyer. That $300,000 would go to Republican State

> Committee: for all three statewide campaigns. Asher said he did not want Dwyer going to jail.
> The next time I saw Dwyer we discussed this situation and from that day forward he was less cooperative.
> During this discussion he said "I thought it was $300,000—Now I hear $100,000." I reiterated that Asher said no money was to go to Dwyer.
> 3. When negotiations were getting tough, I took Mark Phenicie to Cafe Maurice (restaurant) and told him that $300,000 was going to Republican State Committee. Thereafter from time to time Mark indicated to me that Robert Asher had called him on behalf of CTA LTD. John Wellington never knew of this.
> 4. Robert Asher was our principal aide in getting Dwyer to act. I probably spoke to him 20 times—some in Montgomery County and some in Harrisburg at Republican State Headquarters. Frank McCarthy (son of former State Police Commissioner 59–63) sat in on several of these meetings.
> 5. Roy Zimmerman returned a call to me at my home when my wife was present in the room. I asked him to send the decision back

Asher argues that because he did not attack Smith's credibility at trial, Smith's prior consistent statement should not have been admitted under Fed.R.Evid. 801. The Rule provides, in pertinent part, that:

A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ...

(B) consistent with his testimony and is *offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.*

Fed.R.Evid. 801(d)(1)(B) (emphasis added).

The government counters by arguing that counsel for both Asher and Dwyer sought to attack Smith's credibility at trial, thus allowing for the admission of Smith's prior statement under Fed.R.Evid. 801(d)(1)(B). The government also claims that Asher's counsel, independent of Dwyer's counsel, sought to discredit Smith by suggesting that: 1) Smith had originally maintained that he and Asher had done no wrong and that Smith had recently changed his story, *see* Appellee's Brief at 40; and, 2) that Smith had changed his original statement because his wife had been threatened with an indictment. *See id.* at 41.

While the record clearly indicates that *Dwyer's* counsel repeatedly attacked Smith's credibility, thus opening the door to the introduction of Smith's prior consistent statement with regard to Dwyer, we are not persuaded that Asher's counsel joined the attacks made by Dwyer's counsel. The record makes clear the fact that Asher's lawyer expressly stated at trial that he disagreed with Dwyer's lawyer's assertions with respect to Smith's credibility. *See* App. at 1419–20, 1411–13, 1424. Thus, it would be inaccurate to attribute Dwyer's lawyer's statements to Asher's lawyer simply by virtue of the fact that Dwyer and Asher were codefendants.

The record in this case thus weighs heavily against the government on this point. Smith's testimony with respect to his wife's possible indictment was elicited by the government on direct examination, not by Asher's counsel. *See* App. at 1177–1189. Furthermore, Asher's lawyer was careful throughout the trial not to attack Smith's testimony or to claim that Smith's testimony had been recently fabricated. Indeed, Asher's lawyer explicitly stated that he believed that Smith had answered questions about Asher truthfully. *See* App. at 1419–20; 141–13, 1424; Appellant's Brief at 45.

As noted above, Fed.R.Evid. 801(d)(1)(B) "excludes from the definition of hearsay prior statements where the 'declarant testifies at the trial ... and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication.'" *United States v. De Peri*, 778 F.2d 963, 977 (3d Cir.1985) (quoting Fed.R.Evid. 801(d)(1)(B)); *United States v. Provenzano*, 620 F.2d 985, 1002 n. 21 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980). However, absent any charge of recent fabrication or improper influence or motive, a prior consistent statement is inadmissible. The record here does not disclose that Asher's attorney was seeking to attack Smith's testimony by charging Smith with recent fabrication or improper influence or motive.

While it is clear that Dwyer's attorney sought to discredit Smith at every turn during the trial, it is equally clear that Asher's attorney took pains not to do so. Even the district court had misgivings about admitting Smith's prior statement, observing that the government might have to "retry this case," if it insisted upon placing Smith's statement in evidence. *See* App. at 1195. On the basis of the record,

to Dwyer. I told him I would get Torquato to put $150,000 into his campaign. Roy told me to contact Mike Trant to give him the details. I said I did not like dealing with Trant so he said call Pat Boyle. I set up a luncheon with Pat Boyle for May 30, 1984 at the Maverick restaurant. I told Pat at the luncheon about my request to Torquato to put $150,000 into Roy's campaign. He was pleased. He also agreed to have the letter sent to Dwyer as soon as possible.

App. at 1246–47.

Smith's prior statement should not have been admitted.

However, in our view the district court's admission of Smith's statement constitutes harmless error under Fed.R.Crim.P. 52(a). In making non-constitutional "harmless error" determinations as to the admission of evidence, we must determine whether it is "highly probable that the evidence did not contribute to the jury's judgment of conviction." *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976); *accord United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986). To constitute a "high probability," we must have a "sure conviction that the error did not prejudice the defendant." *United States v. Jannotti*, 729 F.2d 213, 219–20 (3d Cir.1984), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). "On the other hand, we may be firmly convinced that the error was harmless without disproving every 'reasonable possibility of prejudice.'" *Id.* at 219–20 & n. 2 (quoting R. Traynor, *The Riddle of Harmless Error*, 33–37, 44–45 (1970)); *accord Grayson*, 795 F.2d at 290.[23]

Under this standard, we are satisfied that the district court's admission of Smith's prior statement is harmless. In addition to Smith's testimony during Asher's trial, *see* App. at 1148–1200, Smith's former attorney, John Rogers Carroll, who had been released from the confidences of the attorney-client relationship, testified as to his discussions with Smith prior to Smith's trial. Carroll, who was examined about Smith's prior statement, corroborated Smith's testimony in much the same way as Smith's prior consistent statement did. *See* App. at 1258–63. For example, Carroll testified as follows:

> What Bill Smith said to me was, the Treasurer and he discussing this, at the conclusion of their talk, both of them thought that Mr. Dwyer should discuss how the money should be paid with Mr. Asher. And he said that Dwyer told him he expected to see Mr. Asher at a political picnic that particular weekend which

was coming up at the time of their discussion, and that picnic or meeting did not occur but there was a later discussion, at least it came back to Bill from Mr. Asher that his feeling about it was the money should not be split the way Mr. Dwyer suggested but all paid into the State Committee rather than split it.

> He told me that they commenced their real negotiations with the Treasurer after that point and had a lot of problems with it. Sometime during those negotiations he was begging Asher to communicate with Dwyer to help them out; that Asher assured him from time to time that he was doing so; that on one occasion he mentioned the contribution to Mr. Phenicie and that eventually they got the contract.

App. at 1261–62.

Thus, contrary to the views expressed in the dissent, we view it as highly probable that the admission of Smith's prior consistent statement did not tip the balance by contributing to the jury's judgment of conviction. We therefore hold that even though Smith's prior statement may have been erroneously admitted into evidence, its admission did not constitute reversible error. *See* Fed.R.Crim.P. 52(a).

## VI.

The district court's order of March 20, 1987, which denied Asher's motion for judgment of acquittal or, in the alternative for a new trial, will be affirmed.

SLOVITER, Circuit Judge, concurring.

I concur fully in Judge Garth's opinion. I write separately only because the dissent states that this opinion cannot be reconciled with this court's recent opinion in *United States v. Boyce*, 849 F.2d 833 (3d Cir.1988), and an opinion that I authored for the court in *Holland v. Attorney General of New Jersey*, 777 F.2d 150 (3d Cir.1985), which

---

23. Even in a constitutional context, Supreme Court has recognized that it has permitted "... harmless error analysis in both capital and non-capital cases where the evil caused by a Sixth Amendment violation is limited to the erroneous admission of particular evidence at trial." *Satterwhite v. Texas*, ── U.S. ──, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).

the dissent graciously but erroneously characterizes as "seminal".

Whether a trial court's error is harmless is a fact-specific judgment. Judge Garth has fully explained why the majority has concluded that the admission of evidence that does not satisfy Fed.R.Evid. 801(d)(1)(B) was harmless in this case. Our conclusion in this respect is no more inconsistent with our precedent than is Judge Higginbotham's contrary conclusion inconsistent with opinions which he authored that concluded that error was harmless, *see, e.g., United States v. Johnson*, 816 F.2d 918, 923 (3d Cir.1987); *United States v. Grayson*, 795 F.2d 278, 288–90 (3d Cir. 1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), or opinions in which he joined that so held, *see, e.g., Government of the Virgin Islands v. George*, 680 F.2d 13, 15 n. 3 (3d Cir.1982); *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 207 (3d Cir.1970), *cert. denied*, 401 U.S. 948, 91 S.Ct. 929, 28 L.Ed.2d 231 (1971).

The Supreme Court "has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). Even when there is error implicating the Constitution, "if the defendant had counsel and was tried by an impartial adjudicator there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis.... Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 3106–07, 92 L.Ed.2d 460 (1986). As Judge Higginbotham pointed out in *Grayson*, "[s]ince the challenged [error] affected no possible constitutional right, we are not required to find that any error ... was harmless beyond a reasonable doubt." 795 F.2d at 290.

As far as I know, no member of this court has been "reticent to recognize prejudicial error." Dissenting op. at 1501. Moreover, the Supreme Court's admonitions prevent us from "routinely" so finding. *Id.* This court has conscientiously applied the harmless error doctrine under the facts of each case, and I am confident will continue to do so irrespective of the particular defendant or the crime charged.

## A. LEON HIGGINBOTHAM, JR., Circuit Judge, concurring in part and dissenting in part.

Although the majority believes the primary question before us is the effect of *United States v. McNally* upon appellant's mail fraud and related convictions, I am convinced that a principled approach to this appeal begins and ends by assessing the only aspect of this appeal that clearly bears upon every count of appellant's convictions: the propriety and effect of the district court's decision to admit into evidence a prosecution witness's prior hearsay statement. Along with the majority, I conclude that the district court abused its discretion when it permitted the prosecution witness, whose credibility had not been attacked by appellant, to read his prior statement into evidence against appellant. Unlike the majority, however, I am convinced that the government has failed to demonstrate that this error was harmless.

I must note that in this case the Court seems more reticent to recognize prejudicial error than it does routinely in other cases. Just two weeks ago in *United States v. Boyce*, 849 F.2d 833, 837 (3d Cir. 1988), this Court held, in ordering a new trial, that the introduction of a hearsay statement of a co-defendant "was the linchpin in the evidence forming a central and cohesive bridge between the circumstantial evidence and the identity of Boyce as a participant in the burglary." In the instant case, the evidence improperly used by the same U.S. Attorney was also a "linchpin in the evidence forming a central cohesive bridge" against Asher. Robert B. Asher should have the same rights as alleged

burglar Aaron Boyce; both are entitled to a fair trial, and I cannot reconcile the rationale of *United States v. Boyce*, with the instant case.[1] From time immemorial, the U.S. Attorney has been obligated to comply with the rules of the game that are designed to assure a fair trial and a rational jury verdict to each defendant. When the U.S. Attorney breaches those rules and profits from his breach, that abuse cannot be overlooked nor should courts be quick to find harmless error to avoid another extended trial. Appellant's convictions should be vacated. Because the majority refuses to recognize the prejudicial impact of the district court's evidentiary error, I respectfully dissent in part.[2]

## I. THE EVIDENCE PRESENTED AND THE PROCEDURAL HISTORY OF THIS MATTER

Because my position is based upon an evidentiary issue, I will, recognizing that what follows repeats parts of the majority's factual account, set forth the salient facts of this prosecution in some detail. I do so to illustrate the relatively "thin" nature of the government's criminal case against appellant, a fact that is minimized in the majority's account of the trial testimony and is of great significance in determining that the evidentiary error was not harmless.

Appellant Robert B. Asher, who was Chairman of the Republican Party of Montgomery County, Pennsylvania, was elected Chairman of the Republican Party of the Commonwealth of Pennsylvania in 1983.

Shortly thereafter, he received a call from William T. Smith, who was then an attorney in private practice and the Republican Party Chairman of Dauphin County, Pennsylvania. Smith was calling on behalf of a client, John Torquato, Jr., whose company, CTA, Limited ("CTA"), specialized in the business of recovering overpaid Social Security taxes ("FICA") for employers and employees. Smith was seeking Asher's assistance in arranging a meeting between Torquato and Robin Ross, a representative of Richard Thornburgh, who at that time was Governor of the Commonwealth of Pennsylvania. When Asher learned that Ross was not available, he set up a meeting between Torquato and John Pierce, who also worked for the Governor.

On the day of the meeting with Pierce, Smith and Torquato first stopped at Asher's office in Harrisburg. They explained to Asher how FICA recovery provided an easy—and, to the Governor, a politically beneficial—way for Pennsylvania to recover a significant amount of money for itself and its state employees. Smith and Torquato expressed to Asher their hope that the Governor's office would award CTA the contract to perform such recovery. At Asher's trial, Torquato, who testified as a government witness, claimed that, during this meeting with Asher, Smith specifically mentioned that CTA would make a $500,-000 campaign contribution if it was awarded the contract. Smith, however, who also testified for the government, denied that precise figures were mentioned at this meeting with Asher and added, moreover, that it was Torquato who had mentioned

---

1. Similarly, I cannot reconcile the holding in this case with the seminal opinion on harmless error of this Court in *Holland v. Attorney General of New Jersey*, 777 F.2d 150 (3d Cir.1985). Undoubtedly, my colleagues have given this record their most careful and thoughtful analysis. However, as the panel of our Court so wisely reminded us in *Holland*, "the review of any criminal trial to determine if there was harmless error inevitably entails a subjective judgment." *Id.* at 159. *Compare United States v. Scarfo*, 685 F.2d 842, 846–47 (3d Cir.1982) (Sloviter, J.) *with id.* at 849–51 (Gibbons, J. dissenting). In this case, my subjective judgment is remarkably different from the majority's. Perhaps that result emanates from our individual readings of the record, but I feel

compelled to express my view in light of the admonishment in *Holland* that "we cannot shirk the responsibility placed upon us when we are convinced that conceded error cannot conclusively be regarded as harmless under any formulation of the harmless error doctrine. This is one such case." 777 F.2d at 159. In my view, just as in *Boyce* and *Holland*, this also is a case in which the conceded error can not be viewed as harmless.

2. Since I write on the evidentiary issue only, it is not necessary for me to comment on whether the majority has properly construed *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

campaign contributions. Smith also noted that Asher did not pursue the issue. Both Torquato and Smith testified that there was nothing improper about this 1983 meeting with Asher.

As the majority notes, Smith and Torquato next met with Asher in March 1984. At this meeting, Asher chastised Smith for having recently offered money to R. Budd Dwyer, the Treasurer of the Commonwealth of Pennsylvania, but there was conflicting testimony at trial concerning how and when Asher had acquired his information about this offer. Torquato testified that he and Smith were, at the time of this meeting, the ones who informed Asher that Smith and Dwyer had previously agreed that CTA would make "contributions" of $300,000 ($100,000 to Dwyer, $100,000 to Dwyer's reelection campaign and $100,000 to the state Republican Committee) to secure the FICA recovery contract. Smith testified, to the contrary, that Asher had learned before this meeting of Smith's offer to Dwyer, and that Asher was the one who brought it up. Torquato and Smith agreed, however, that Asher was upset, that he told them that they and Dwyer could go to jail for what they were proposing to do, and that Asher said that contributions, if there were to be any, should go to the state Republican Committee.

After this meeting, Smith called Asher on numerous occasions, seeking his aid in getting Dwyer to sit down with CTA to negotiate the contract.[3] In addition, Torquato and Smith met with Asher on one other occasion. At that time, Smith and Torquato discussed the difficulty they were encountering as they tried to get Dwyer to sit down with them and negotiate the FICA recovery contract.

Dwyer, without soliciting competitive bids, awarded the statewide teacher FICA recovery contract to CTA on May 10, 1984.

In July 1984, the FBI began investigating CTA and the awarding of this contract. Thereafter, Torquato decided to cooperate with the government and pleaded guilty to one count of conspiracy. Smith, who had been indicted in the meantime, attempted to negotiate immunity from prosecution in exchange for his cooperation. The government refused to give Smith immunity and insisted that he plead guilty to a felony count. Smith refused and went to trial, where he took the stand in his own defense and denied offering campaign contributions to Dwyer or to Asher. Asher and Dwyer testified for the defense at Smith's trial. Smith ultimately was convicted and sentenced to twelve years in prison. Thereafter, the government threatened to indict Smith's wife and law partner, Judy Smith. At that point, Smith agreed to cooperate with the government in exchange for its promise not to prosecute his wife and in the hope of reducing his own sentence.

The prosecution of Asher and Dwyer then commenced. They were tried together in Williamsport, Pennsylvania. On December 18, 1986, the jury returned guilty verdicts against each defendant on the con-

---

**3.** On cross-examination, Smith indicated that his calls to Asher were largely unproductive:

> Q. Now, sir, you had testified on direct ... that you had had several contacts with Mr. Asher after this meeting by telephone and whatnot, and I believe you testified ... that you weren't going to Mr. Asher for help, but that you wanted him to see if he could get Mr. Dwyer to sit down and negotiate with you, is that correct, sir?
> A. Help in getting him to sit down and negotiate. I didn't want him to go in there and negotiate for us. I wanted him to help us to get Mr. Dwyer to come in and negotiate with us.
> Q. You also I believe testified on direct that you felt that Mr. Asher became irritated with you, and that you were becoming sort of a pest to him on this, is that correct?

> A. Yeah, I was a pest. I pestered him. I don't know if I was a pest. I pestered him.
> Q. What caused you to reach that judgment[,] that Mr. Asher thought you were becoming a pest and whatnot?
> A. Well, a couple of times it took me awhile to get to him.
>
> . . . . .
>
> Q. ... In all of these contacts where you're pestering him, asking him to see if he can get you a meeting so you can negotiate with Mr. Dwyer, he never even mentions this campaign contribution?
> A. Never even, he just didn't.
> Q. Never did after that one meeting?
> A. No.

Joint Appendix ("Jt. App.") at 1125–27.

spiracy, mail fraud, interstate transportation in aid of racketeering ("ITAR") and perjury counts. On December 31, 1986, Asher filed a motion for acquittal or, in the alternative, a new trial. On January 27, 1987, the district court sentenced Asher to concurrent prison sentences of one year and one day on the various counts, and it imposed fines totaling $205,000 plus a mandatory special assessment of $50. Joint Appendix ("Jt.App.") at 1562–63 (Judgment and Probation/Commitment Order). The district court subsequently granted Asher's motion for release on bail pending appeal, *United States v. Asher*, Crim. No. 86–00088–02 (M.D.Pa. Feb. 6, 1987), *reprinted in* Jt.App. at 1597–1604, but it denied Asher's motion for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c) or, in the alternative, for a new trial pursuant to **Fed.R.Crim.P.** 33. *Asher*, Crim. No. 86–00088–02 (M.D.Pa. Mar. 20, 1987), *reprinted in* Jt.App. at 1700–07.

## II. *THE ERRONEOUS ADMISSION OF SMITH'S PRIOR STATEMENT*

### A. *Factual and Legal Background*

In December 1984, William Smith, who was under indictment for conspiracy, mail fraud and ITAR, gave his attorney a written offer of proof. This typed statement, which had been prepared by Smith's wife from his handwritten notes, Jt.App. at 1187–88, was for Smith's attorney to use in immunity negotiations with the government. *See* Government Exhibit 119, *reprinted in* Jt.App. at 1246–47. In the statement, Smith admitted, *inter alia*, offering campaign contributions to Asher and Dwyer. *Id.* The most damaging portion of the statement concerning Asher was its fourth paragraph, which referred to him as CTA's "principal aide in getting Dwyer to act." *Id.* at 1246. At Smith's own trial in 1985, he contradicted the contents of this earlier written statement when he testified that he had never offered contributions to anyone.[4] In 1986, when Smith testified for the prosecution at Asher's trial, the government sought to neutralize the potentially negative impact of Smith's prior testimony upon his credibility as a witness by introducing, as a prior consistent statement, his original written offer of proof to the government.

Smith's prior statement had been made available to Asher's defense through pretrial discovery, and it was the subject of a motion *in limine* that was filed, opposed and denied without prejudice shortly after Asher's trial began. Jt.App. at 7–8 (docket sheet); Brief of Appellee at 37 n. 26. At trial,[5] Asher, but not Dwyer, objected to the admission of Smith's statement.[6] The district court, which had previously received legal memoranda from both parties, heard additional arguments on this issue at a side bar conference. Asher argued to the district court, as he does on appeal, that the introduction of Smith's original written statement as substantive evidence against Asher was erroneous and prejudicial.

The district court overruled Asher's objections, Jt.App. at 1195, 1197, and allowed Smith, on redirect examination by the government, to read into evidence his prior written statement, including the key line that identified Asher as CTA's "principal aide in getting Dwyer to act." *Id.* at 1195, 1197.

The district court admitted Smith's prior written statement as substantive evidence against both Asher and Dwyer under Federal Rule of Evidence 801(d)(1), **"Prior statement by witness,"** which provides that

[a] statement is not hearsay if— ... [t]he declarant testifies at the trial or hearing

---

4. Smith's earlier written statement was not admissible against him at his own trial because it was an admission made in the process of plea bargaining with the government. **Fed.R.Crim. P.** 11(e)(6)(D).

5. The trial was, of course, actually a joint trial of Asher and Dwyer. Asher's pretrial motion to sever his case from Dwyer's was denied by the district court.

6. Asher disputed the admissibility of Smith's prior statement in a motion *in limine*, in objections at trial and in a post-trial motion. The specific remedy he urged upon the district court was redaction of the fourth paragraph of Smith's statement.

and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive....

Fed.R.Evid. 801(d)(1)(B). Asher claims on appeal that the district court's decision to admit the evidence pursuant to this Rule was an abuse of discretion for three distinct reasons. First, Asher claims that the evidence was improperly admitted because he, unlike his co-defendant Dwyer, had not attacked or even questioned Smith's credibility. Asher argues, therefore, that, because the portion of Smith's written statement that concerns Asher was not properly introduced under Rule 801(d)(1)(B) "to rebut an express or implied charge against [Smith] of recent fabrication or improper influence or motive," id, it was inadmissible hearsay. Second, Asher argues that the evidence was improperly admitted because the statement is not "consistent with [Smith]'s testimony" at Asher's trial. Id. Finally, Asher alleges that the evidence was improperly admitted because any motive that Smith may have had·to fabricate his trial testimony already existed at the time he made his prior statement to the government.

On this difficult evidentiary issue,[7] the panel is in agreement that the district court abused its discretion because the government was not entitled to put Smith's statement into evidence against Asher. This conclusion has both legal and factual components. The legal component, on which our standard of review is plenary, involves the interpretation of Rule 801(d)(1)(B). The majority concludes, albeit implicitly, that, under the rule, credibility attacks on a witness by one defendant do not suffice to make that witness's prior statements admissible under Rule 801(d)(1)(B) against the co-defendant(s).[8] The factual component concerns the conduct of Asher's defense in relation to the testimony of witness Smith. The Court again is in agreement, based upon a thorough review of the relevant trial transcripts and drawing all inference in favor the government, see, e.g., Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Provenzano, 620 F.2d 985, 989 n. 4 (3d Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), that the district court's finding that Asher called Smith's credibility into question was clearly erroneous. To clarify the basis of the Court's evidentiary holding, I will address these arguments in turn and in considerable (but, to my mind, necessary) detail.

### B. Asher's, Not Dwyer's, Is The Defense That Counts

The plain terms of Rule 801(d)(1)(B) indicate that the first prerequisite to the introduction of a witness's prior statement is that the statement must be offered to rebut an attack on the witness's credibility. In this case, the record demonstrates that Paul J. Killion, Dwyer's trial attorney, directly and vigorously attacked the credibility of the trial testimony offered by the government's cooperating witness, William Smith. Thus, when the United States Attorney, on redirect examination, asked Smith to read into evidence those portions of his prior statement that concerned Dwyer, it is not surprising that Killion raised no objection. See Jt.App. at 1189. As the district court noted in passing, there was simply "[n]o question about Mr. Killion and Mr. Dwyer" having opened the door to the admission of such evidence. Id. at 1192.

---

7. The district court, in the course of admitting this evidence over Asher's objection, gave the United States Attorney a warning: "All right. Well, I'm going to overrule the objection. You may have to retry this case, Mr. West, if you want·to put [Smith's statement] in. You are entitled to do it." Jt.App. at 1195. Although the majority concludes otherwise, I view this warning as sobering and, indeed, quite prescient.

8. The district court, in denying Asher's acquittal/new trial motion, decided that his attorney's questioning implied that Smith had fabricated his testimony. Although the district court's factual finding to this effect was clearly erroneous, the Court agrees with the district court's implicit legal conclusion (i.e., that Asher's cross-examination was the proper focus of the factual inquiry).

The Court rejects the notion, however, which is implicit in many of the government's arguments, that Killion's attacks upon Smith's credibility were, by themselves, sufficient to make Smith's prior statement admissible against *both* Dwyer and Asher under Rule 801(d)(1)(B). Although this rule describes the event that makes such evidence admissible as "an express or implied charge against the declarant of recent fabrication or improper influence or motive," **Fed.R.Evid.** 801(d)(1)(B) (emphasis added), without specifying *who* must make that charge, the rule does not seem to contemplate situations where *more than one* individual would be the subjects against whom the adverse evidence is being introduced, *e.g.*, the codefendants in a criminal trial with multiple defendants.[9] The rule apparently was written for the simple world of straightforward, two-party trial proceedings; its language does not address more complicated proceedings with multiple parties on one "side." In this regard, it is particularly telling that the Advisory Committee's Note to Rule 801(d)(1)(B) discusses *"the* opposite party [who] wishes to open the door for [a prior statement's] admission in evidence...." 56 F.R.D. 183, 296 (1973) (emphasis added). This reference to the conduct of *an* individual litigant reinforces the logical conclusion that the rule's reference to "a[ ] ... charge" of fabrication does not indicate that *any* charge by any party renders admissible that witness's prior statements concerning every party on that side of the case. Instead, the rule guarantees that the prior statement of an adverse witness may be admitted against a party only after he or she has opened the door to the statement's admission.

The threshold issue that concerns us here—whether the statement was admitted to rebut a particular party's "express or implied charge of recent fabrication or improper influence or motive"—has not been contested in any case in which this Court has dealt with the admission of a witness's prior statement under Rule 801(d)(1)(B). In *Provenzano*, however, where the appeal arose from the prosecution of multiple defendants, this Court found that the witness's prior consistent statement was "relevant to rebut *the defense claim*—express or implied—that [the witness] was lying *against all the defendants* in return for benefits from the Government." 620 F.2d at 1001 (emphases added); *accord United States v. De Peri*, 778 F.2d 963, 977 (3d Cir.1985) (one-defendant trial; witness's prior statement was offered, "[o]n re-direct examination, to rebut *defense counsel's* implied charge that [the witness] constructed [ ]his story as a bargaining chip when [he] sought immunity from prosecution") (emphasis added), *cert. denied sub nom. Pecic v. United States*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 *and sub nom. Katz v. United States*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986).

*Provenzano* and *De Peri* demonstrate a clear concern on the part of this Court to note exactly who made the accusation that prompted the prosecution's introduction of a witness's prior statement,[10] and to admit such a statement only against a defendant who has opened the door to such rebuttal evidence. In doing so, these decisions properly recognize that personal triggering is a prerequisite to the admission of a witness's prior statement under Rule 801(d)(1)(B) against a party. In other words, the prior consistent statement of a

---

9. For instance, Rule 801(d)(2), which like Rule 801(d)(1) is an exception to the general rule that hearsay evidence is inadmissible to show the truth of the matter asserted, is triggered when the admission of a party-opponent "is offered against *a* party...." Fed.R.Evid. 801(d)(2) (emphasis added).

10. In *Provenzano*, for example, we noted that "[s]ome evidence of [the witness's] deal with the federal government was introduced in cross-examination, *by Provenzano's lawyer*, who raised the issue of [the witness's] bias or motive...."

620 F.2d at 1001 n. 20 (emphasis added); *accord United States v. Snead*, 447 F.Supp. 1321, 1326 (E.D.Pa.) (a "prior statement ... offered to rebut *the* charge of recent fabrication ... [is] exactly the type of evidence contemplated by Federal Rule of Evidence 801(d)(1)(B)") (emphasis added), *aff'd without published opinion*, 577 F.2d 730 (3d Cir.) (table), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2829, 56 L.Ed.2d 775, 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 154 (1978), *and* 441 U.S. 909, 99 S.Ct. 2003, 60 L.Ed.2d 379 (1979).

witness may only be introduced into evidence against a party who has made a direct or implied charge that the witness is not credible.

I recognize that, in the context of a criminal trial with multiple defendants, one defendant's attacks on the credibility of a government witness may redound to the benefit of the codefendants.[11] The theoretical possibility of such free riding does not, however, call for an unprecedented and open-ended reading of Rule 801(d)(1)(B). Indeed, an argument that our decision gives Asher, on the one hand, the benefit of Dwyer's attack on Smith's credibility while, on the other hand, allowing Asher to exclude Smith's prior statement simply by stating that Asher, after all, was not the one alleging fabrication by Smith, would, as Judge Newman once wrote, "ha[ve] things backwards...." *United States v. Figueroa,* 618 F.2d 934, 940 (2d Cir.1980).

> It is the Government that is trying to enjoy the benefit of having put [Asher] on trial with [his] co-defendant[] and then offering evidence against him on grounds available, if at all, only as to his co-defendant[]. The advantages to the prosecution of a joint trial do not include that maneuver.[12]

*Id.*

Having explained why, as a matter of law, Smith's prior statement was not admissible against Asher merely because Dwyer attacked Smith's credibility, I will now turn to the next step in the argument, which is the factual aspect of this appeal. Although the majority brushes by many of the government's factual arguments, I believe that a court that is often the court of last resort owes both sides a fuller explanation of its reasoning. Accordingly, I will examine the trial transcript to determine whether the district court was clearly erroneous in finding that Asher, through his attorney, made a direct or implied charge that Smith's trial testimony was recently fabricated or otherwise improperly influenced or motivated.

### C. Asher's Defense Did Not Include The Requisite Attack on Smith's Credibility

#### 1. Hundley's Opening Statement

The government's most direct argument that Asher did attack Smith's credibility is based upon the opening statement of William G. Hundley, Asher's attorney, which told the jury that

> you're going to hear, as you've heard already from Mr. West, the United States Attorney], you're going to hear a lot of evidence about how Smith and Torquato came in with the evil intent of corrupting the Commonwealth of Pennsylvania. Certainly we're not disputing that at all[,] that these two now convicted felons did this, and that as Mr. Killion indicated, you should view their testimony with great suspicion.... Please, you're going to hear a lot of things about what these two convicted felons[, i.e., Torquato and Smith,] did in Pennsylvania which you're not going to like and you shouldn't like.... All I ask you to do is don't let that influence your decision, your judgment of Robert Asher.

Jt.App. at 141–42. While this passage may be construed as a promise of a forthcoming

---

**11.** Of course, this will not always, or even often, be the case. In this prosecution, for example, where Asher and Dwyer were tried together, Smith's testimony for the government supported reasonable inferences that were harmful to Dwyer and exculpatory to Asher. Thus, to the extent that Dwyer succeeded in impeaching the credibility of government witness Smith, the jury might have concluded that Asher's conduct was *more* culpable than Smith's testimony indicated on its face.

**12.** The district court eloquently explained the problem with this "maneuver" when it sustained this same objection in an unrelated situation at

trial where, ironically, the roles of the two defense attorneys were reversed.

> [T]he [witness's] reference ... did fall within the ambit of what was opened up on cross by Mr. Hundley, but I am concerned about having it held in any way attributable to Mr. Killion's examination, and it worries me that his client is going to get tagged with something that came up not of [Killion's] volition but rather from Mr. Hundley's volition and so for that reason I'm going to sustain Mr. Killion's objection.

Jt.App. at 1279.

attack on Smith's credibility, an opening statement is not, unlike cross-examination of the government's witnesses, a substantive part of the defense. *Cf. United States v. Green,* 648 F.2d 587, 595 (9th Cir.1981) (*per curiam*) ("An opening statement, ... having no evidentiary value, cannot operate to place an issue in controversy."). In the context of this particular ground of Asher's appeal, it is significant that the relevant subsection of the Rule is called "**Prior statement by witness,**" Fed.R.Evid. 801(d)(1) (emphasis added), that it applies only to those instances where "*[t]he declarant testifies* at the trial or hearing *and is subject to cross-examination ...*", *id.* (emphases added), and that this subsection provides specifically that such a prior statement may be "offered to rebut an express or implied charge *against the declarant....*" **Fed.R.Evid.** 801(d)(1)(B) (same). No one can be such a "declarant," of course, until he or she has taken the stand and testified.[13] A defendant's opening statement, standing alone, thus does not, within the meaning of this evidentiary rule, constitute an attack on the credibility of a forthcoming witness.[14]

In addition, even if an opening statement could open the door to the admission of a witness's prior statement, the record does not support an inference that this was such a case. At the time Hundley made the quoted opening statement, he knew only that Torquato and Smith were cooperating with the government and had agreed to testify against Asher and Dwyer. He did not know—and could not have known—what specific testimony each of these prospective witnesses would offer against each of the defendants. Discovery had alerted Hundley to the fact, however, that Smith's story was much more favorable to Asher than was Torquato's. Accordingly, Hundley told the jury, just minutes before he made the portion of his opening statement quoted above, that

> in this case there will really only be two witnesses against Mr. Asher. Those two witnesses will be Mr. Torquato and Mr. Smith, ... and there is going to be substantial contradictions [sic] between the two Government witnesses, Torquato and Smith....

Jt.App. at 133–34. Hundley also noted, referring back to the prosecutor's opening statement, that "Mr. West ... has a prob-

**13.** Taken to its logical extreme, the government's "opening statement" argument would destroy the hearsay rules as we know them, for, in its view, whenever a defense attorney's opening statement contained *any* remark that could be construed as attacking the credibility of an anticipated adverse witness, the government could *begin* building its case by introducing as substantive evidence that witness's prior, out-of-court statements. Rule 801(d)(1)(B), by contrast, requires events to proceed in a more logical manner: testimony by a witness, impeachment of that testimony by opposing counsel, and then the introduction of the witness's prior statement to rebut the inference of recent fabrication.

**14.** The government claims that *United States v. Feldman,* 711 F.2d 758 (7th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983), indicates that "statements in an opening address" are clearly adequate to invoke the hearsay exception of Rule 801(d)(1)(B). Brief of Appellee at 45. *Feldman* was a case where the attorney for the only defendant, "[d]uring [his] opening statement, ... elaborated at considerable length on the 'deal' [a witness] had made with the prosecutors." 711 F.2d at 766. In addition, "[d]uring cross-examination, the defense [attorney] questioned [the witness] about the role the government would play in the event

that any state licensing agency should bring a disciplinary action against him." *Id.* At this point in the trial, the district court held a lengthy side bar conference, where it

> repeatedly asked the defense if it intended to argue that the [witness's] plea agreement was a motivation to fabricate. The court pursued the issue [at side bar] for ten pages of trial transcript.... Finally, after a recess, defense counsel stated that he intended to talk about the plea agreement during closing argument, but that he did not intend to argue that it was a motivation for recent fabrication. However, since the defense could offer no other inference that it intended to draw from the plea agreement, the [district] court permitted the introduction of the [witness's] prior consistent statement.

*Id.* It was *on this basis* that the Court of Appeals for the Seventh Circuit "agree[d] with the district court that [defendant] Feldman's use of the plea agreement was to impliedly charge that it motivated [the witness] to fabricate his trial testimony." *Id.* The fact that Feldman's attorney had first referred to the witness's plea agreement in his opening statement was a fortuity that played no role in the appellate court's Rule 801(d)(1)(B) analysis.

lem with Mr. Torquato because of his credibility ...," *id.* at 137; Hundley did not, by contrast, indicate that he or anyone else had a definite concern about Smith's credibility. Thus, whatever its legal significance, it would have been clearly erroneous had the district court found that Hundley's opening statement, read as a whole and in context, indicated that attacking Smith's credibility would definitely be part of Asher's trial defense.

### 2. Hundley's Cross-Examination of Smith

#### a.

Hundley began his cross-examination by explaining to Smith the guideline that would govern the questioning: "All right, sir. I want to ask you some questions, and we'll try to confine my questions strictly to the testimony you've given about my client, Mr. Asher." Jt.App. at 1100. The record indicates that much of Hundley's questioning drew out Smith's neutral, and in many instances favorable, testimony. One example is a line of questions concerning Torquato's practice of sending Asher copies of CTA FICA recovery proposals and related correspondence prepared by CTA:

---

Q Now, about the same time [as the Torquato–Smith–Pierce meeting,] we've had testimony that a copy of the proposal was sent to Mr. Asher, is that correct, sir?

A I didn't testify to that. I believe that Mr. Asher got a copy of it, yes. And that came from John Torquato.

Q Did you instruct Mr. Torquato to send that proposal?

A No, I didn't.

Q Did you ever instruct Mr. Torquato that Mr. Asher should be cc'd on this various correspondence?

A No, that was Mr. Torquato's doing.

Q Did you ever instruct Mr. Torquato that blind cc's should be sent to Mr. Asher?

A No.

Q Did Mr. Asher ever ask you to have all this correspondence and proposals sent to him?

A No. He never mentioned to me that he was receiving it.

Q It's your testimony, sir, that it was just Mr. Torquato who on his own decided to send these proposals, blind cc's, letters to Mr. Asher?

A No. My testimony is that I didn't ask him to do it and didn't know how it happened.

Q You're quite correct, sir.

---

*Id.* at 1115–16. Another example is Hundley's final question concerning the first Torquato–Smith–Asher meeting (the one that moved Asher to set up a meeting for Torquato and Smith with a representative of the Governor's office):

Q So would it be fair to say, sir, that the sum result of your first meeting with Mr. Asher on FICA recovery for state employees was that he set up one meeting with Mr. Pierce?

A Yes.

*Id.* at 1118. A final, and perhaps the most indicative, exchange occurred when Hundley questioned Smith about the March 1984 meeting between Torquato, Smith and Asher:

Q Now, you testified on direct that at some point during this meeting, and I'm trying to quote your testimony accurately[,] that an angry and upset Mr. Asher chastised you?

A Yes, he did. He was upset that I would make an offer of a contribution to Mr. Dwyer while we were negotiating a contract with him.

. . . . .

[H]e indicated that he had had a conversation with Mr. Dwyer, and he knew that I had made an offer to him of a $300,000 contribution, and then he was very angry when he began to talk about that, angry with me. Said he thought I knew better than to offer a contribution to Mr. Dwyer, and he said if there was going to be a contribution, it was going to go to Republican State Committee.

Q Was he in essence telling you that it was wrong for you to have offered a bribe?

A I believe that he was saying it was wrong for me to have offered that. He didn't use the word bribe. He used the word contribution.

Q He did say—warn you that if you did it that way, you could go to jail?

A He didn't want to see anybody go to jail.

Q He didn't want to see anybody go to jail.

A He didn't say, Smith, you're going to jail for that. He said I don't want to see anybody going to jail, and there will be no contribution to Dwyer.

Q But the one that he was principally chastising and lecturing, if I could use that paraphrase, was you?

A Absolutely.

Q And as far as you were concerned[,] after you had received this very stern warning and jail lecture, was that the end of any bribe offers as far as you were concerned?

A I felt very bad about that. I felt bad from the moment I talked to Mr. Dwyer. It was a very, very upsetting period of time for me. Although when we went out of the meeting, Mr. Torquato[,] instead of saying we're not going to give anybody any contributions or we're going to give contributions to the State Committee, he said, well, we're in a fix now. We owe them each 300,000 big ones.

Q Now, your testimony though, sir, is that after Mr. Asher chastises you on this matter that he says if there's going to be any campaign contribution, it's going to come to the State Committee, right?

A Yes.

Q And I noticed that in all of your [statements to the FBI] and your Grand Jury testimony and all of your prior statements to the government, you had always said that that [was] what Mr. Asher said[,] that if there's going to be any campaign contribution, it goes to the State Committee?

A Yes, that's what he said.

Q And isn't it a fact, sir, that after Mr. Asher had chastised you and had said that he didn't want anybody going to jail and that if there was going to be any campaign contribution, it would come to the State Committee, that that was the last time that he ever mentioned that campaign contribution to you?

A That was the last time he ever mentioned it to me, and I never mentioned it to him.

*Id.* at 1121–25.

Although there are obvious limits to a reviewing court's ability to determine, merely by reading the pages of a trial transcript, the thought processes of a lawyer conducting cross-examination, the only plausible inference—supported both by the extensive passages I have quoted, and by other testimony that my colleagues and I have read—is that Smith's testimony set forth a version of events that Asher, via Hundley, thought he could explain to the jury, justifying Asher's conduct as politically motivated but not criminal. Thus, at the commencement of Hundley's re-cross-examination, nothing in the record indicates that he was attacking Smith's credibility. The questions, rather, reiterated what already had been established:

Q And I cross examined you at some length yesterday afternoon strictly about my client, Mr. Asher. Is that a fair statement, sir?

A I would say that your questions were directed about Mr. Asher's involvement in this case, yes.

Q Right. And is it not a fact that you answered all of my questions about Mr. Asher's involvement, as you say, truthfully?

A Yes. Yes, I have.

Q And sir, until I cross examined you in behalf of my client yesterday, had I ever talked to you about this case or the evidence in this case?

A No, sir, you never talked to me about the case. We had about two brief handshake discussions in Mr. West's office.

Jt.App. at 1222. Indeed, at the end of re-cross-examination, Hundley asked ques-

tions that can only be viewed as emphasizing the veracity of Smith's testimony:

Q Is basically what you've testified to about Mr. Asher in this trial?

A Yes.

Q All right. And your testimony is that you have testified truthfully about Mr. Asher in this trial.

A Yes.

Q And your further testimony is that you answered all of my questions about Mr. Asher truthfully.

A Yes.

Q All right.

MR. HUNDLEY: That's all I have, Your Honor.

*Id.* at 1230.

The trial transcript, read as a whole, therefore provides no basis for an inference that Hundley's cross-examination attacked Smith's credibility or implied that Smith had recently fabricated his testimony. I now turn to the specific arguments to the contrary that have been asserted by the government.

b.

The government's first claim is that questions concerning the presence of other people at Smith's meetings with Asher, *see, e.g.,* Jt.App. at 1108, 1121, implied that the Smith–Asher meetings were innocent ones; that implication, in turn, is claimed by the government to be inconsistent with Smith's trial testimony. The claim that Hundley's questions made such an implication may, to a degree, be correct. The argument goes no further, however, because any such implication would be consistent with Smith's testimony concerning those meetings; the questions, in other words, did not impeach any of Smith's testimony at Asher's trial. In addition, it was the prosecutor, on direct examination of Smith, whose questions elicited testimony concerning the presence of other people during the Smith–Asher meet-

ings. Jt.App. at 739–40, 795. In general, I fail to understand how cross-examination that replicates direct examination can constitute a claim that a witness is fabricating his or her testimony.[15]

The government's second claim is more powerful. It focuses upon Hundley's questions of Smith concerning the assurances that he had given to Asher prior to Smith's trial. The government claims that these questions—which elicited admissions that Smith had told Asher that Smith would be taking the stand in his own defense, *see* Jt.App. at 1141–43, and that Smith had "always take[n] a position with Mr. Asher that [Smith] had done no wrong, and [Asher] said he did [sic] no wrong," *id.* at 1145 —were designed to imply that Smith told the truth at his own trial and, thus, that he was lying at Asher's trial. I conclude that it would be clearly erroneous to draw such a complex inference from this opaque portion of the trial record. Hundley, following up on part of West's direct examination, did ascertain that a Smith–Asher conversation in a Holiday Inn parking lot the night before Smith's trial was "a chance meeting," *id.* at 1141, but Hundley's questioning immediately thereafter was concerned with the assurances that Smith gave to *his own attorney. Id.* at 1142–45. Moreover, the government's claimed implication of fabrication is not supported by anything in the clarifying, and concluding, line of questioning that followed:

Q I believe, sir, you testified that your attorney advised you to testify.

. . . . .

A He came up here [to Williamsport]. And [my attorney and his partner] talked to me about some recent [Supreme] Court decisions that said that I would have to tell the truth on the stand. And I told them that I was—the story I was going to tell was going to be the truth, when, in fact, it was not.

**15.** In the context of an unrelated argument that no member of this panel finds it necessary to reach, the government's brief mentions its right to impeach its own witness. *See* Fed.R.Evid. 607. Since there is no basis for construing anything in West's direct examination of Smith

as an attempt to impeach the witness, however, Hundley's replication of parts of West's questioning does not raise an inference, via Rule 607, that Hundley was accusing Smith of fabricating his testimony.

Q Mr. Smith, how did you reconcile this with the proffers that [your attorney] had been making to Mr. West?

A How did I reconcile that with that?

Q Yes.

A I told them that that was not true, the proffers were not true, the night before I testified.

Q You told [your attorney] that the proffers were not true?

A Yes, the night before I testified.

*Id.* at 1150–51. This line of questioning did no more than establish the sequence of events that preceded Smith's decision to testify at his own trial.

The government's third claim is that Hundley, by mentioning during cross-examination the existence of Smith's prior statement, opened the door to its introduction as substantive evidence for the prosecution. This argument is predicated solely upon speculation about Hundley's intent in making a number of passing references to the statement, and it is not supported by anything that Hundley actually said. Hundley made no reference to the contents of Smith's prior statement and did not ask Smith whether his prior statements to the government were consistent with the direct testimony that he was in the process of giving at Asher's trial. Indeed, as we read the transcript, the only permissible inference is that Hundley curtailed his questioning in this sensitive area. By only mentioning the existence of Smith's proffer, Hund-

ley did nothing to give the government a basis for introducing that prior statement into evidence.

The government's fourth claim is that Hundley, through a passing reference to the government's threat to indict Smith's wife, implied that he had a motive to lie. This argument has no merit. The "slip" by Hundley that this argument relies upon occurred in the brief that Asher filed with this Court, not in Hundley's cross-examination of Smith at trial. *See* Brief of Appellee at 40–41 (quoting "Page 12 of Defendant Asher's Brief"). By contrast, the trial transcript reveals that there was no mention of the threat to indict Judy Smith in Hundley's cross-examination of William Smith.[16]

c.

To summarize this factual analysis, a thorough review of the trial transcript convincingly indicates that there is record support for only one reasonable inference: Hundley was scrupulously careful not to attack Smith's credibility. This is true is as a general matter, and the government's specific arguments to the contrary, focused upon particular passages of Hundley's cross-examination of Smith, each lack merit. The record discloses no evidentiary basis for the district court's finding that Asher's attorney implied that Smith's testimony was a recent fabrication. Thus, as to Asher, the panel is in full agreement that

16. The government's remaining arguments, made in passing, lack merit and deserve little comment. The claim that Hundley's cross-examination of Torquato, whose credibility Hundley *was* attacking, showed that Hundley's methods of implying witness fabrication were more subtle throughout this trial than were Killion's, is interesting, but it is unsupported by specific record references and is subsumed, I believe, by the other claims that I have already addressed. The fact that Hundley submitted to the district court proposed points for charge that, when construed very broadly, can be viewed as touching upon parts of Smith's story or his credibility as a witness, is irrelevant; proposed points for charge are obviously not part of the substantive evidence before a jury, which is the focus of provisions such as Rule 801(d)(1)(B). The claim that it would not have been an abuse of discretion for the district court to admit into evidence the full story of the threat to indict

Judy Smith, including how that threat related to William Smith's offer to cooperate with the government, is also irrelevant; the contents of Smith's proffered statement are not relevant to this "full story," and, in any event, Smith could not have read this prior statement into evidence against Asher unless and until Smith's credibility had been attacked by Asher's attorney.

The government's final claim deserves special mention. That Hundley "used the witness Smith to impeach Torquato's testimony concerning whether or not the dollar figure of $500,000 had been mentioned at the first Asher meeting and $300,000 at the 1985 Asher meeting," Brief of Appellee at 39, exemplifies the exact point of Smith's appeal. Much of Smith's testimony was, at least in comparison to Torquato's testimony, favorable to Asher's claim to have committed no crime. That is the reason why Hundley "used the witness Smith to impeach," as opposed to impeaching him.

Smith's prior hearsay statement that Asher was CTA's "principal aide in getting Dwyer to act" was not admissible under the exception of Rule 801(d)(1)(B).[17]

### D. *Admission of Smith's Prior Statement Was Not Harmless Error*

At this late point in the evidentiary analysis, the majority and I part company. The Federal Rules of Criminal Procedure provide that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." **Fed. R.Crim.P.** 52(a); *accord* **Fed.R.Evid.** 103(a). In this appeal, where the error at trial was not of a constitutional dimension,

> we must apply the "highly probable" standard of appellate review to determine the harmlessness of the error. *Government of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976). "High probability" requires that the court have a "sure conviction that the error did not prejudice the defendant," but [it] need not disprove every "reasonable possibility" of prejudice. *United States v. Jannotti*, 729 F.2d 213, 219–20 & n. 2 (3d Cir.1984) [, *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984) ].

*United States v. Grayson*, 795 F.2d 278, 290 (3d Cir.1986), *cert. denied*, — U.S. ——, 107 S.Ct. 1899, 95 L.Ed.2d 505, *and sub. nom. Robinson v. United States*, 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987). In assessing the harm caused by the district court's erroneous admission of Smith's hearsay statement against Asher, the beneficiary of the error—*i.e.*, the government—bears the burden of demonstrating its harmlessness. *United States v. Molt*, 615 F.2d 141, 145–46 (3d Cir.1980).

The government's only specific argument concerning harmlessness, which the majority accepts, is a brief and undeveloped allegation that Smith's prior statement was cumulative to the testimony of John Rogers Carroll. Carroll was Smith's trial attorney. Once Smith began cooperating with the government, he released Carroll from the ethical constraints and confidences of their attorney-client relationship. Carroll thus testified for the government at the trial of Asher and Dwyer.

Carroll's testimony fails adequately to support the government's contention that the admission of Smith's prior statement did not prejudice Asher's rights. As an initial matter, it is significant that Carroll's testimony at trial occurred *after* the district court overruled Asher's objection and permitted Smith to read his prior statement into evidence.[18] Further, apart from this obvious problem of sequence, Carroll's testimony fell far short of providing the kind of "formidable array of other evidence," *United States v. Engler*, 806 F.2d 425, 430

---

**17.** Because Asher's Rule 801(d)(1)(B) argument succeeds at the threshold, there is no need to address his independent contentions (1) that Smith's prior statement was not consistent with his trial testimony, and (2) that, because Smith's prior statement was not made before his motive to fabricate arose, it was inadmissible to rebut a charge of recent fabrication. *See De Peri*, 778 F.2d at 977 (while "[t]he timing of consistent prior statements divides the courts of appeals[,] ... [w]e find it unnecessary to enter this debate here"); *see generally* Note, *Prior Consistent Statements: Temporal Admissibility Standard Under Federal Rule of Evidence 801(d)(1)(B)*, 55 Fordham L.Rev. 759, 759 (1987) ("A controversy has arisen among the federal courts of appeals as to whether admissibility of ... a prior consistent statement is contingent on its being made prior to the alleged fabrication or improper motive. The majority of courts that have addressed the issue find this temporal requirement implicit in FRE 801(d)(1)(B), in order to ensure the statement's relevance;" Note defends this majority approach) (footnotes omitted);

*see, e.g., United States v. Vest*, 842 F.2d 1319, 1329–30 (1st Cir.1988) (Campbell, C.J., joined by Garth and Bownes, JJ.); *but cf. United States v. Obayagbona*, 627 F.Supp. 329, 337 (E.D.N.Y. 1985) (Weinstein, C.J.) ("Generally, it would seem useful to drop this ... element.... There is no warrant for it in the language of the rule and it unnecessarily complicates the court's problems in administering trials. Rules 401 to 403 provide a better and more flexible guarantee of fairness."); Note, *Prior Consistent Statements and Motives to Lie*, 62 N.Y.U.L.Rev. 787, 788 (1987) ("because any admitted prior consistent statement is subject to cross-examination about motive in front of the trier of fact, evaluation of a motive to fabricate a statement is unnecessary").

**18.** The majority, viewing Asher's trial as a finished product rather than as an unfolding presentation of evidence, chooses not to mention which evidence was cumulative *from the jury's point of view.*

(3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1900, 95 L.Ed.2d 506 (1987), that would make it highly probable that the admission of Smith's statement did not affect Asher's rights. Indeed, although Carroll's testimony fleshed out some of the details concerning *how* Smith's prior statement originally was offered to the government in an attempt to negotiate immunity for Smith, Carroll's testimony *in no way* duplicated the contents of Smith's statement. The excerpt from Carroll's testimony that the majority quotes simply contains nothing that is comparable to Smith's crucial characterization of Asher as CTA's "principal aide in getting Dwyer to act." In addition, Carroll's testimony generally *corroborated* Smith's testimony that Asher, notwithstanding Smith's pestering phone calls, vetoed the bribery scheme that Smith and Torquato had negotiated with Dwyer. For all these reasons, the majority's claim that Smith's statement was harmless because it was cumulative to Carroll's testimony is, given the record, factually indefensible.[19]

Two undisputed facts explain why the government is, in this case, unable to meet its burden of showing that the introduction of Smith's prior statement did not prejudice Asher. One is the fact the Smith's prior statement, Government Exhibit 119, was transmitted to the jury during its deliberations along with all the trial exhibits. Memorandum Of Points And Authorities In Support Of Motion of Defendant Asher For Judgment Of Acquittal Or, In The Alternative, For A New Trial at 24, *reprinted in* Jt.App. at 1632. The fact that Smith's written statement was physically available, on paper in the jury room, for the jury to consider during its deliberations is enough to view it as playing a significant role in the jury's determination.[20]

The other salient fact that refutes the government's harmlessness contention is the graphic and forceful way that Smith's prior statement was argued to the jury in the government's closing argument.[21] The U.S. Attorney called the jury's attention to this crucial evidence as follows:

> [W]ay back when in 1984 [Mr. Smith] had told *the truth* to Mr. Kleckner and to Mr. Carroll[, his attorneys,] and it *had been conveyed to the FBI one Saturday*

---

**19.** *See generally United States v. Bernal,* 814 F.2d 175, 185 (5th Cir.1987); *United States v. Taylor,* 508 F.2d 761, 765 (5th Cir.1975); *Savoy v. Savoy,* 220 F.2d 364, 367 (D.C.Cir.1954); *cf. generally Pennsylvania v. Ritchie,* 480 U.S. 39, 51–52, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987) (plurality opinion) (evidence "that a witness is biased, or that testimony is exaggerated or unbelievable ... can make the difference between conviction and acquittal").

**20.** *See United States v. Pendas–Martinez,* 845 F.2d 938, 941 (11th Cir.1988) ("It is an abuse of discretion ... to admit into evidence and send to the jury room government agent case summaries which constitute a written summary of the government's theory of the case."); *United States v. Brown,* 451 F.2d 1231, 1234 (5th Cir. 1971); *United States v. Ware,* 247 F.2d 698, 701 (7th Cir.1957) ("The error ... was compounded by the fact that the jury was permitted, over objection by the defendant, to have the exhibits in the jury room during its deliberations. The jury thus had before it a neat condensation of the government's whole case against the defendant. The government's witnesses in effect accompanied the jury into the jury room. In these circumstances we cannot say that the error did not influence the jury, to the defendant's detriment, or had but a very slight effect."); *EEOC v. Colgate–Palmolive Co.,* No. 81 Civ.

8145, slip op. at —— (S.D.N.Y. Feb. 3, 1986) [available on WESTLAW, 1986 WL 1810].

**21.** *See generally Rainey v. Beech Aircraft Corp.,* 784 F.2d 1523, 1528 (11th Cir.) ("defendants were able to capitalize on the improper admission of [opinion evidence] by highlighting the opinions to the jury during closing argument"), *vacated,* 791 F.2d 833 (11th Cir.1986), *reinstated on rehearing en banc,* 827 F.2d 1498 (11th Cir. 1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 1073, 99 L.Ed.2d 233 (1988); *United States v. Reynolds,* 715 F.2d 99, 105 (3d Cir.1983) ("In this case there is much more than the mere risk of prejudice.... There is actual prejudice. Here, the powerfully incriminating hearsay statement was admitted into evidence ... and offered again by the government in its closing argument to the jury as circumstantial evidence...."); *United States v. Palumbo,* 639 F.2d 123, 128 (3d Cir.) (error was not harmless where, *inter alia,* "hearsay testimony ... was impermissibly commented on by the prosecutor during cross examination and in his closing"), *cert. denied,* 454 U.S. 819, 102 S.Ct. 100, 70 L.Ed.2d 90 (1981); *cf. generally United States v. Zarintash,* 736 F.2d 66, 72 (3d Cir.1984) (where "the Government in its summation did not mention, let alone stress," the evidence that was admitted in error, its admission was harmless).

*morning in a U.S. Attorney's Office and* Ladies and Gentlemen *that truth is frozen at that point in time.*

. . . . .

Smith and Torquato are the window dressing, Ladies and Gentlemen, but you also know when they made their statement the first time, Government Exhibit 119, Mr. Smith, and his attorney testified he said this as early as October, his offer of proof....

Jt.App. at 1354, 1400 (emphases added). At this point in his summation, United States Attorney West began to read to the jury, word-for-word, from Smith's prior statement, including the allegation that "Robert Asher was our princip[al] aid[e] in getting Dwyer to act." *Id.* at 1401. When West concluded reading from the statement, he again told the jury that, "Ladies and Gentlemen, *that* is caught in time just like those exhibits...." *Id.* at 1401–02 (emphasis added).

In these circumstances, I have no confidence at all, let alone the required "sure conviction," that the erroneous admission of evidence did not prejudice Asher's rights. Smith's hearsay statement is exactly the kind of evidence—a damning piece of paper, available in the jury room throughout the period of deliberation—that the jury may have seized upon as a decisive factor in convicting Asher on the various counts. In addition, the government reiterated and emphasized this inadmissible evidence as a central theme of its closing argument. Although Smith's prior statement concerning Asher was brief, it became a cornerstone of the government's case against him. With the cornerstone removed, Asher's convictions cannot stand.[22]

### III. *CONCLUSION*

For the foregoing reasons, I believe that the government has failed—by a margin that is not even close—to bear its burden of demonstrating that the evidentiary error at appellant's trial was harmless. Accordingly, I vote to vacate his conspiracy conviction, his mail fraud convictions, his ITAR convictions, his perjury conviction and the sentences and fines imposed on all counts, solely on the ground that prejudicial hearsay evidence was illegally admitted into evidence against him.[23] I respectfully dissent from those portions of the majority's opinion that are inconsistent with this approach.

**22.** *See United States v. Versaint,* 849 F.2d 827, 831–832 (3d Cir.1988) (erroneous exclusion of police report not harmless); *Boyce,* at 831 ("Far from being harmless error, the introduction of McMahon's statement was the linchpin in the evidence forming a central and cohesive bridge between the circumstantial evidence and the identify of Boyce as a participant in the burglary."); *United States v. Pearson,* 746 F.2d 787, 795–96 (11th Cir.1984) ("[T]here was no testimony that [defendant] had access to or had ever occupied the upstairs area where most of the guns [that the court admitted into evidence against him] were found. In fact, the evidence was to the contrary. Furthermore, the court gave no instruction limiting the extrinsic evidence against [defendant] to the two guns found in his bedroom. While we can find no abuse of discretion in admitting the firearms against [his codefendant], their admission against [defendant] was irrelevant and prejudicial.").

Because, in my view, Asher is legally entitled to complete relief on the evidentiary aspect of his appeal, there is no need to address Asher's remaining, independent, claims (1) that the jury charge improperly amended the indictment, and (2) that each of his convictions was based upon a scheme to defraud the public of its "intangible" right to a public official's loyal, faithful and honest services, which scheme, since *McNally,* is not encompassed by the federal mail fraud statute.

**23.** Of course, even if a majority of the panel was persuaded to take this approach, the government would remain free to reprosecute appellant on any counts on which he may be or remains lawfully indicted.